## SIX HUNDRED TONS OF IRON ORE.

*(District Court, D. New Jersey. December 10, 1881.)*

**1. FORFEITURES—LIENS FOR FREIGHT.**

Where freight is earned before the government makes its election whether to declare the merchandise, of which a false and fraudulent entry has been made, forfeited, or to recover its value by suit against the parties making the entry, and the former proceeding is finally chosen and the property is sold, *held*, that such freight must be paid out of the proceeds of the sale, the owners of the vessel having no knowledge before it was earned of any offence, committed or premeditated.

**2. SAME—DELIVERY.**

Manual delivery of the cargo by the ship-owners to the consignees does not, of itself, operate necessarily to discharge their lien for freight. Where the intent of the ship-owners in making such delivery is to discharge the cargo, and not to deliver it, their lien for freight remains in full force.

*Jas. K. Hill* and *Wing & Shoudy*, for petitioners.

*A. Q. Keasbey*, U. S. Atty., for the Government.

NIXON, D. J. The petition is filed in this case by the owners of the steam-ship Italia, of the Anchor line, to recover from the proceeds of the sale of a quantity of iron ore, now in the registry of the court, the sum of $1,305.61, as freight for the transportation of said ore in the Italia from the port of Almeira, in Spain, to the port of New York. The ore was shipped at Almeira by one Joseph Ribiera, about the ninth of March last, and was to be carried to New York and delivered to Messrs. Schenck & Co., for the freight of nine shillings British sterling per ton of 2,000 pounds weight, and the usual bills of lading were executed therefor. Before its arrival there Schenck & Co. entered into a written contract to sell the cargo to Joseph K. Wells. The ore was guarantied to be not less than 55.56 of iron and 3.42 of manganese, making a total metallic yield of 58.98. A deduction of 10 cents per unit per ton to be made for any less percentage, and 10 cents per unit per ton added for any excess; the analysis to be determined from sample to be drawn from the cargo as discharged, and to be analyzed as received. The price agreed upon was $5.90 per ton, duty and all charges paid, and to be delivered to the purchaser from the ship at the harbor of New York, and to be paid for—one-half cash on delivery of custom-house permit, and the balance on presentation of United States weigher's certificate of weight, and certificate of sampling and analysis. On the date of the execution of the contract Wells paid $200 on account, and in advance of the approximate one-half to be paid by him on the delivery of the custom-house permit; the said

Schenck & Co. agreeing, if the ore did not arrive, to pay back the said $200. The steam-ship reached her pier in the port of New York on the twentieth of April, 1881. Schenck & Co. paid the duties and obtained the usual custom-house permit for the landing of the ore, which they delivered to Wells on the next day, (21st,) and received from him $1,670 on account of payment on the whole shipment. Wells then procured and sent to the steam-ship three barges or canal-boats, with instructions to take the ore on board and proceed to the railroad dock of the Morris & Essex road, at Hoboken, New Jersey, and there remain until he gave further orders. The steam-ship company began to discharge the ore on the twenty-second and finished on the twenty-eighth of April, the three boats crossing the river at different times and mooring in the basin of the Morris canal. On the twenty-ninth the collector of New York, discovering a fraudulent undervaluation of the goods by Schenck & Co., the importers, caused the same to be seized while yet in the basin of the Morris canal at Hoboken; reported the seizure to the district attorney for this district, who filed the usual information in such cases for forfeiture, and duly condemned the cargo, no one appearing to contest the forfeiture. Pending these proceedings the marshal took possession of the ore, and, by order of the court, sold it for $3,200, and paid the proceeds of the sale into the registry of the court, where they still remain. Are the owners of the steam-ship entitled to demand and receive from these proceeds the freight money still due and unpaid on the importation, or are they obliged, under the circumstances, to look to the consignees for payment?

The case presents two questions for consideration: (1) Was the lien of the ship-owners on the cargo for freight lost by the delivery made? (2) If not, does the forfeiture of goods, under sections 2839, 2864, Rev. St., extend to and include the interest of *bona fide* lienors without notice of the fraud?

It is conceded that by the maritime law the ship-owner had a lien upon the goods transported for the freight, unless there be some stipulations in the contract of affreightment inconsistent with the exercise of the lien; as, for instance, when the freight is made payable at a date subsequent to the delivery of the cargo. For, unlike the *privilegium* under the civil law, the lien for freight depends upon the possession, and is lost when an unconditional delivery is made, or when any agreement is entered into by the parties in regard to the payment of freight, which involves a prior surrender of the possession. In the present case, the ship-owners, undoubtedly, intended to have

and retain a lien on the merchandise for the freight; for, in addition to their right under the law-merchant, they inserted a clause in the bill of lading that "the captain or owner should have a lien on the goods for the payment of freight and all expenses;" and on the day after the arrival of the steamer in New York, they caused a notice to be served upon the superintendent of the dock, as appears to be their custom when the consignee is unknown, or they are not willing to trust to his personal responsibility, to hold the ore until the freight was paid. These facts are important, in so far as they rebut any presumption drawn from the acts of the parties of the waiver of the lien. *The Kimball*, 3 Wall. 44. With the above notice in their possession, the agents of the owners began to unload the ore into the canal-boats on the twenty-second of April, and continued until it was all discharged, on the 28th. One of the boats, in the mean time, being loaded, left the pier and crossed the river to the Morris canal basin. The remaining two, having received the residue of the cargo, followed her there. The superintendent says that he did not know of the departure of the first boat; but he acknowledges that he was informed of it before the others left, and offered no objections, and took no steps to have it brought back. His testimony in the matter is quite significant. Being asked, "Did you make any remonstrances to the men that were in the other two boats about the first one going away?" he answered: "No, sir; I thought everything was all right, because the same man had been taking ore from us previous to that, and I supposed there would be no trouble about it." Nor did he make any efforts to ascertain its destination, and did not know where it had gone until some days afterwards, when, at the request of the captain, he visited the boat in the Morris canal basin, to examine into some alleged damage which it had received from the steamer while loading the ore. Libellant's Testimony, pp. 27, 28. It is often a difficult question to determine what acts on the part of the ship-owner amount to a waiver of the lien for freight. It is not divested by a delivery to the consignee or his agents if conditions are annexed to the delivery, or if there be an understanding, express or implied, that the lien shall continue. *Bags of Linseed*, 1 Black, 108.

In *151 Tons of Coal*, 4 Blatchf. 468, Judge Nelson went still further and said that "the mere manual delivery of the coal by the carrier to the consignee did not, of itself, operate necessarily to discharge the lien. The delivery must be made with the intent of parting with his interest in it, or under circumstances from which the law will infer such an intent." Applying these principles to the

facts, it is a close question whether the lien has been waived or not. I confess to a serious doubt on the subject. But, remembering that a court of admiralty is the "chancery of the seas," and that the libellants have a strong equitable claim upon the forfeited goods for freight, in view of the fact that the transportation added considerably to their value here, I incline to the opinion that the intent of the owners was to discharge the cargo, and not to deliver it, and that the lien for the costs of transportation has not been waived. I am strengthened in this opinion by the additional facts that the bills of lading have never been surrendered, and no receipt given to the steam-ship for the ore, as is customary in such cases, after delivery.

2. The ore has been forfeited under sections 2839, 2864, of the Revised Statutes. Does such forfeiture carry with it the lienor's interest in the condemned merchandise? Some discussion took place between the respective counsel, at the hearing, in regard to the effect which the recent legislation of congress had upon this question. By the third section of the act of March 2, 1867, (section 2981, Rev. St.,) the collector, or other chief officer of the customs, is authorized, on being notified in writing, by the owner or consignee of any vessel, of a lien for freight on any merchandise imported in such vessel, to refuse the delivery of the same from any public or bonded warehouse, or other place, in which the same shall be deposited, until proof to his satisfaction shall be produced that the freight has been paid or secured. The provisions of this section were modified by a substitute passed June 10, 1880, (Supp. to Rev. St. vol. 1, p. 547,) in which the proper officer of the customs, on receiving the said notice of lien for freight, is required, before delivering the merchandise to the importer, owner, or consignee, to give seasonable notice to the parties claiming a lien, and containing the further provision that the possession of the goods by the officers of the customs shall not affect the discharge of such lien. Both the original section and the substitute contain the clause: "If merchandise so subject to a lien, regarding which notice has been filed, shall be forfeited to the United States, and sold, the freight due thereon shall be paid from the proceeds of such sale in the same manner as other charges and expenses, authorized by law to be paid therefrom, are paid." The district attorney insists that as no notice was given to the proper officer of the customs the case does not come within the provisions of the act, and no statutory authority can be invoked to pay the freight out of the proceeds of the sale. The counsel for the petitioners, on the other hand, contends that no notice was required, as none of the iron ore went into a public or bonded warehouse,

and that the merchandise, without notice, falls within the intention and spirit of the law. He regards the act as the expression of the legislative intent to preserve and give effect to the ship-owner's lien in all cases of forfeiture to the government, and quotes Potter's Dwarris on Statutes, etc., p. 144, in support of his position: "The intention of the legislature may be found from the act itself, from other acts *in pari materia*, and sometimes from the cause or necessity of the statute; and wherever the intent can be discovered, it should be followed with reason and discretion, though such construction seems contrary to the letter of the statute." But these are rules of interpretation, when the words of the law are obscure, and there is no obscurity in the act under consideration. I am not prepared to affirm that when congress explicitly gives to parties certain rights, upon their performance of certain antecedent acts and conditions, they are entitled to claim the rights, without showing that they have performed the acts and conditions.

But this question turns, in my judgment, upon other considerations, to which I shall now advert. There are a large number of statutes in both the customs and internal-revenue acts which subject property, used in violation of the law, to forfeiture. It is sufficient, for my present purpose, to divide these statutes into two classes,—one class forfeiting the offending *res* absolutely, without reference to liens of innocent holders, or the claims of *bona fide* purchasers without notice; and the other only condemning the interest of the guilty owner, and preserving the rights of honest lienors or purchasers. Most of the sections for forfeiture, under the internal-revenue laws, belong to the former classs, and many of those under the customs laws to the latter. Whether the statute falls within one class or the other depends upon the phraseology used by congress in its enactment. Where it makes the forfeiture absolute, it is within the former class, and the forfeiture is incurred at the time of the commission of the act which works the condemnation, and the title is vested in the United States from that date. No matter how long afterwards proceedings are taken to enforce the forfeiture, the right of the government runs back, by relation, to the time of the commission of the wrongful acts, and cuts out all intervening claimants, however innocent. But when a statute gives an alternative to the United States, either to forfeit the offending thing or its value by suit against the offending person, it comes within the latter class; because the government acquires no title to the property until its proper officers make an election whether they will proceed against the *res* or against the offender for its value,

and in the mean time, pending the election, all *bona fide* encumbrances are protected. The question as to the time when the transfer of right in the thing forfeited takes place, was first fully discussed and settled in the case of *U. S.* v. *Grundy*, 3 Cranch, 338. Under the act of December 31, 1792, for registering and recording ships or vessels, (section 4143, Rev. St.,) it was provided that taking a false oath as to ownership forfeited the vessel or the value thereof. The suit was brought to recover the vessel in the hands of a *bona fide* purchaser, without notice of the fraud in the registry, on the ground that title had vested in the United States at the instant of the commission of the offence for which the forfeiture was claimed. Chief Justice Marshall, in delivering the opinion of the court, stated the question to be whether, by virtue of the act, the absolute property in the ship or vessel vested in the United States, either in fact or in contemplation of law, on the taking of the false oath, or remained in the owners until the United States should perform some act manifesting their election to take the ship, and not the value. He held to the latter view, and in his luminous way said:

"It seems to be of the very nature of a right to elect one of two things: that actual ownership is not acquired in either until it be elected, and if the penalty of an offence be not the positive forfeiture of a particular thing, but one of two things, at the choice of the person claiming the forfeiture, it would seem to be altering materially the situation in which that person is placed to say that either is vested in him before he makes that choice. If both are vested in him it is not an election which to take, but which to reject. It is not a forfeiture of one of two things, but a forfeiture of two things of which one only can be retained."

This construction of the class of statutes which forfeit the property with an alternative of its value, was acquiesced in by the attorney general of the United States in the discusion of the case of *1,960 Bags of Coffee*, 8 Cranch, 398, and was afterwards deliberately reaffirmed in *Caldwell* v. *U. S.* 8 How. 366, where the supreme court reached the necessary conclusion of such a construction, by holding that any rights in the forfeited property, acquired in good faith by third persons, after the offence and before the date of the election, were not divested by the decree of condemnation. It will not be suggested, after the case of *The Siren*, 7 Wall. 152, that the government stands in any different relation to the money in the registry than do private suitors, except that it is exempt from the payment of costs. It will be seen, by reference to the sections (2839, 2864) under which the ore was condemned, that they are both in the alternative. The United States had an election, in either case, whether to forfeit the merchandise, or

to recover its value by suit against the persons making the false and fraudulent entry. They chose the former proceeding; but, in the mean time, the owners of the steamer, without knowledge of any offence, committed or premeditated, earned the freight which was agreed to be paid for its transportation, and ought not now to be refused its payment from the proceeds of the sale of the forfeited property.

Let an order be entered directing the clerk to pay to the petitioners the sum of $1,305.61 out of the proceeds in the registry.