### NORTH AMERICAN COMMERCIAL CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 7, 1897.)

No. 337.

FORFEITURE OF VESSEL TO UNITED STATES—LIENS FOR SUPPLIES.
   The forfeiture of a vessel to the United States does not cut off liens of innocent parties for supplies furnished in a foreign port prior to the act for which the forfeiture is declared. 74 Fed. 246, reversed.

Andros & Frank and Williams, Wood & Linthicum, for appellant.
Daniel R. Murphy, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. The schooner Louis Olsen was on November 25, 1895, condemned as forfeited to the United States, for having, on September 2, 1895, killed fur seals within the prohibited zone of 60 miles around Pribilov Islands, in violation of the act of congress approved April 6, 1894. Under the decree of condemnation, the schooner was sold, and the proceeds of the sale were paid into the registry of the court. On December 9, 1895, the North American Commercial Company filed its libel of intervention against the vessel and the proceeds, alleging that in July, 1894, at the port of Dutch Harbor, a foreign port, at the request of the master of the Louis Olsen, and on the credit of the vessel, the company had furnished the vessel with provisions, supplies, and other necessaries, amounting to $400; that the vessel was then about to go upon a sealing voyage, and the said supplies were used by the vessel on the voyage upon which she was engaged when she was seized; that they were essential for such voyage, and were furnished in good faith, and without knowledge that any illegal venture or voyage was about to be undertaken. The United States filed an exception to the libel, as impertinent. The

exception was sustained, and a final decree was entered, dismissing the bill.

The intervener appeals from the decree, and on the appeal presents the question whether the condemnation of a vessel as forfeited to the United States defeats a maritime lien created in good faith prior to the illegal act for which the forfeiture is declared. This precise question does not appear to have been before presented for decision, except in the single case of The Florenzo, Blatchf. & H. 52, Fed. Cas. No. 4,886, to which reference will be made hereafter. Both the appellant and the appellee cite and rely upon the decision of the supreme court in the case of The St. Jago De Cuba, 9 Wheat. 410, in which it was held that forfeiture does not overreach maritime liens which attached between the date of the illegal act and the subsequent seizure of the vessel for forfeiture on account thereof. In that case, an American vessel, whose owner resided at the port of Baltimore, was sent out in ballast to 'Cuba. There she was colorably conveyed to a resident of that island, and was furnished with a Spanish coasting license, and thence she proceeded on a voyage to Havana, thence to Matanzas, where she was equipped for the African trade. On her voyage to the coast of Africa, she was pursued by hostile vessels, and was compelled to put into Baltimore to refit. While there, she was libeled by the United States for violation of the slave-trade acts, and was condemned as forfeited. On the appeal to the supreme court, the question arose whether the liens of material men who refitted her in Baltimore upon her return, and subsequent to the illegal acts for which she was forfeited, were subsisting liens upon the vessel, the material men claiming to have furnished the supplies upon the belief that the vessel was, as she claimed to be, a Spanish vessel, and that they were ignorant of the fact that in reality her home port was Baltimore. In discussing the question whether the prior forfeiture of the vessel to the United States should preclude the general rights of the material men, and place them on the footing of subsequent purchasers, whether with or without notice of the forfeiture, the court said:

"These questions are all solved by a reference to the nature, origin, and objects of maritime contracts. The precedence of forfeiture has never been carried further than to overreach common-law contracts entered into by the owner, and it would be unreasonable to extend them further. The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to the forfeited hull, to get back for the benefit of all concerned; that is, to complete her voyage. There are two considerations that fully illustrate this position. It is not in the power of any one but the shipmaster—not the owner himself—to give these implied liens on the vessel; and in every case the last lien given will supersede the preceding. The last bottomry bond will ride over all that precede it, and an abandonment to a salvor will supersede every prior claim. The vessel must get on. This is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity. * * * We concur, then, in the opinion of the court below that the fair claims of seamen and subsequent material men are not overreached by the previous forfeiture."

Upon the part of the appellee it is urged that it is only because the supplies were furnished subsequent to the illegal act in the St. Jago

De Cuba Case that the lien therefor was protected by the court, and that the purpose of such protection was to sustain the ship's credit, and enable her "to get back for the benefit of all concerned; that is, to complete her voyage." If such were the reason upon which the decision in that case was based, the facts to sustain it did not exist in the record which was then before the court. At the time when the supplies were furnished the vessel, she was in her home port. It was there that she was seized, upon the libel of the United States. So far as the libelant was concerned, there was no benefit to be gained by her being fitted out to proceed thence to any other port. Indeed, the supplies were furnished to enable her to leave the jurisdiction of the United States, and proceed a second time upon an illegal voyage. The only ground on which a lien for supplies furnished after forfeiture can be favored is that it is for the benefit of the new title which vests in the United States. It certainly cannot be asserted as a general principle that all supplies furnished after the illegal act will result in benefit to the new title, or that it will be of advantage to the United States to enable a vessel to get on, no matter where she may be. We do not think it was the intention to place the lien upon so narrow a ground. The general principles announced in that case are broad enough to cover all cases where materials and supplies have been honestly furnished a vessel in a foreign port, to enable her to proceed. They apply as well to maritime liens created before the commission of the illegal act as to those subsequent thereto. The language above quoted, "The precedence of forfeiture has never been carried further than to overreach common-law contracts entered into by the owner," excludes from its operation all liens of material men, no matter at what date they may have attached.

In the later case of The Siren, 7 Wall. 152, the supreme court clearly intimated that such was the scope of its prior decision. Referring to the liens of material men, which were held to be protected in the St. Jago De Cuba Case, it said: "These claims arose subsequent to the illegal acts which created the forfeiture; yet they were not superseded by the claim of the government." It is the clear implication of this language that, if the claims had arisen prior to the illegal acts, in the opinion of the court still stronger reason would have existed for their protection, as against the claim of the government.

The Florenzo, Blatchf. & H. 52, Fed. Cas. No. 4,886, was a case of seizure for violation of the act of December 31, 1792, under which it was declared that "such ship or vessel, together with her tackle, apparel and furniture, shall be forfeited." It was held that the forfeiture, under the statute, does not avoid the liens of seamen and material men existing at the time of the forfeiture.

There are in other cases expressions of the opinions of admiralty courts upon this subject, which, while they fall short of actual adjudications, nevertheless indicate the views of judges learned in the law. In U. S. v. Wilder, 3 Summ. 308–314, Fed. Cas. No. 16,694, Judge Story, in delivering the opinion of the court, said:

"It is by no means true that liens existing on particular things are displaced by the government becoming or succeeding to the proprietary interest. The lien of seamen's wages and of bottomry bonds exists in all cases as much against the government becoming proprietors, by way of purchase or forfeiture or otherwise, as it does against the particular things in the possession of a private person."

This language was quoted with approval by the supreme court in The Siren, 7 Wall. 160.

In The Mary Anne, 1 Ware, 104, Fed. Cas. No. 9,195, referring to the lien of an attaching creditor, whose lien was created prior to the seizure on which the vessel was forfeited to the United States, the court said:

"It is not a claim like that of seamen's wages, or that of material men, which overreaches the forfeiture. The attachment operates only to the extent of the debtor's interest, to whose rights, so far as his lien goes, the attaching creditor succeeds, while the maritime lien of seamen for their wages, and of material men for supplies and repairs, is a species of proprietary interest in the thing itself, which is independent of the title of any particular individual. It inheres in the thing, whoever may be the general owner."

The Maria, Deady, 89, Fed. Cas. No. 9,075, was a case of forfeiture, under section 27 of the registry act of December 31, 1792. The court said:

"Nor do I wish to be understood as admitting that a forfeiture of a vessel affects the lien of the crew thereon, unless such forfeiture is caused upon or by the voyage on which such wages are earned; and that, too, by the vessel's being employed in some transaction or voyage which is made a crime for any one to aid or participate in, or the unlawful purpose of which is manifest to the commonest understanding."

In The Ranier, Deady, 438, Fed. Cas. No. 11,565, the same learned judge said:

"But if the forfeiture of the boat or an interest therein was absolute, and transferred the property therein from the time of the violation of the act to the United States, still it seems that it would be subject to the claims of the seamen and material men. The United States would take it as a purchaser cum onere."

In The City of Mexico, 28 Fed. 207, in a case of a seizure and forfeiture of a vessel, it was held that where the seamen have been ignorant of the character of the illegal voyage, and innocent of knowingly participating in the wrong, their wages will be paid in preference to the claim of the government, although the vessel may be forfeited.

In The Jennie Hayes, 37 Fed. 373, which was a case of seizure to recover penalties for violation of certain provisions of the Revised Statutes, the court said:

"The question for determination is as to the priority of the liens. The fact that the government has, by purchase, forfeiture, or otherwise, become the owner of a vessel, does not, ipso facto, displace or defeat liens in favor of seamen or material men, is settled by the decisions of the supreme court in the cases of The St. Jago De Cuba, 9 Wheat. 409, and The Siren, 7 Wall. 152."

Counsel for the appellee cites the case of Six Hundred Tons of Iron Ore, 9 Fed. 595, in which the court divides the statutes providing for

forfeitures into two classes,—the one forfeiting the offending res without reference to liens of innocent holders or the claims of bona fide purchasers without notice; the other only condemning the interest of the guilty owner, and preserving the rights of honest lienors or purchasers. In that case the court said:

"Whether the statute falls within one class or the other depends upon the phraseology used by congress in its enactment. Where it makes the forfeiture absolute, it is within the former class, and the forfeiture is incurred at the time of the commission of the act which works the condemnation, and the title is vested in the United States from that date. No matter how long afterwards proceedings are taken to enforce the forfeiture, the right of the government runs back, by relation, to the time of the commission of the wrongful acts, and cuts out all intervening claims, however innocent."

It is not to be supposed that, in expressing thus broadly the effect of a forfeiture, the court intended to include the material man's lien among the "intervening claims" which are extinguished thereby, for the St. Jago De Cuba Case holds directly to the contrary.

The light afforded by these decisions and the expressions of the courts, added to that to be derived from a consideration of the nature and purpose of the material men's lien and the policy of the law in recognizing the same, leads us to the conclusion that the right of a lienor, who in good faith has furnished supplies and materials to a vessel, in ignorance of any purpose on the part of her master or owners to devote her to an illegal use, should not be overreached by a subsequent forfeiture of the vessel. The lien, as has often been said, is created for the benefit of the ship, to enable her to reach her destination. It would seriously impair the power of her master to procure supplies in a foreign port upon her credit if the material man is to hold his lien subject to the contingency that the vessel may incur forfeiture under one of the many provisions of law, the violation of which would render her liable thereto. It would be of little avail to bestow such a lien, and at the same time to give the lienor so uncertain a tenure. We think that the exceptions should have been overruled. The decree of the court below will be reversed, and the cause remanded for further proceedings not inconsistent with these views.