PIONEER FUEL CO. v. McBRIER et al.

(Circuit Court of Appeals, Eighth Circuit. December 6, 1897.)

No. 882.

1. ADMIRALTY APPEALS—FINDINGS OF FACT.
   Quære: Whether the act of February 16, 1875 (18 Stat. 315) requiring circuit courts to find the facts in admiralty cases, and limiting the review of the cause on appeal to the supreme court to the questions of law arising on the record, applies to causes decided by the district courts and reviewed on appeal by the circuit courts of appeal under the judiciary act of 1891. But, in any event, the cause goes to the circuit court of appeals for review, rather than for trial.

2. DEMURRAGE—DELAY IN UNLOADING.
   Where, by the bill of lading, the cargo is to be delivered "free of handling" at the private dock of a consignee known to have special facilities for unloading, the vessel will be entitled to demurrage for unnecessary delay of the consignee in beginning the discharge, although the total time consumed, including the delay, is not longer than would have been occupied in discharging at a public dock of the same port with the inferior facilities there afforded.

3. SAME.
   The right of a vessel carrying cargo "free of handling" to a lien for demurrage for delay of the consignee in beginning to discharge is not affected by the fact that the delay arose from the refusal of the consignee to receive the cargo because damaged on transit by an excepted peril, and the fact that during the delay the consignee was negotiating with the owner to purchase the damaged cargo at a reduced price.

4. SAME—WAIVER OF LIEN—DISCHARGING CARGO.
   Discharging cargo after giving notice of a claim for demurrage is not a waiver of the lien, where such cargo is placed on the dock, and kept separate from other goods, so as to be capable of identification.

Appeal from the District Court of the United States for the District of Minnesota.

This is an appeal from a decree of the district court of Minnesota awarding to the libelants $500 demurrage damages. The decree was entered in that court on October 13, 1896, and the facts found are as follows: On July 13, 1895, the steamship Nyanza, owned by libelants was chartered by John King and J. G. McCullough to convey a cargo of 2,012 tons of hard coal from Buffalo, N. Y., to Duluth, Minn., and there deliver the same to the Pioneer Fuel Company, the claimant. King and McCullough were the agents of the owners of the coal, who were at that time unknown to the libelants and to the master of the steamship. On July 15th the steamship came into collision with another vessel, whereby the steamer was damaged, and sank with its cargo; but it was promptly raised, repaired, and pumped out, and thereupon proceeded upon its voyage with the larger portion of its cargo, reaching Duluth on the evening of July 23d. Notice of its arrival was immediately given to the consignee, the fuel company. On the morning of July 24th the steamship was ready to have its cargo discharged, and the agent of the consignee examined the cargo, and directed the master of the steamship to bring it to the dock of the consignee, which was accordingly done. There were already at such dock two vessels to be unloaded, having precedence of the steamship, but the last of them was completely discharged of its cargo, and the steamship was in its proper place at the dock in readiness to have its cargo immediately discharged at 11 o'clock in the forenoon of July 25th, and the master of the steamship then demanded of the consignee that it discharge the cargo. The consignee, with its mechanical appliances upon the dock, could fully have discharged the cargo before 6 o'clock on the evening of July 26th, but refused and neglected to do so, claiming that the coal had been injured by water and iron rust, and, instead of proceeding to discharge the cargo, entered into negotiations with the owner for the purchase thereof at a reduced price. On

July 27th the master notified the consignee in writing that the cargo had been in readiness for delivery since July 24th at 7 o'clock a. m., and that by reason of the neglect of the consignee to unload, or provide facilities for doing so, the owners of the vessel would look to the consignee and to the cargo for demurrage at the rate of $200 a day, beginning July 24th. On July 31st the consignee, having purchased the coal from the owners, notified the master of the steamship that it was ready to unload, and between the hours of 7 o'clock a. m. and 7 o'clock p. m. of August 1st, it completely unloaded and discharged the steamship of its cargo. After the purchase by the consignee, the master and owners of the vessel requested the consignee to preserve the identity of the cargo, notifying it that they should hold the cargo and their lien thereon for demurrage. When unloaded, the coal was placed on the dock in a large bin, or inclosure, and, while near to two other piles of coal, was so situated that its identity was not lost, and its removal could have been effected without disturbing any of the other coal. On August 2d this libel was filed, and the coal seized. The court further found that by reason of the neglect and failure of the shippers and consignee to unload and discharge the cargo the steamer was unnecessarily detained five secular days, and that the damage by reason of such unnecessary delay amounted to $100 a day, or $500 in the aggregate. There was, in the first instance, some dispute as to the matter of freight, and the findings cover the question of freight as well as that of demurrage, but this has been settled, and the only matter now in dispute is that of demurrage.

E. L. McMillan, for appellant.

H. R. Spencer (F. E. Searle, on the brief), for appellees.

Before BREWER, Circuit Justice, and SANBORN and THAYER, Circuit Judges.

BREWER, Circuit Justice, after stating the case as above, delivered the opinion of the court.

Courts in admiralty, like courts of equity, hasten to consider the substance of right, and do not tarry long on mere matters of form. Hence we shall not stop to discuss certain questions of practice suggested by counsel for appellant, merely remarking in passing that we see nothing in any ruling in respect thereto which wrought injury to the substantial rights of the appellant. Obviously, if only the findings of fact are before us for consideration there can be little doubt of the justice of the decree. There is a distinct finding of an unreasonable detention, of the time of such detention, and the damages caused thereby. Nor is there anything in the other findings which diminishes the significance of this one, or operates to relieve from the conclusion which it compels. So that, if this were a common-law action coming from a trial court, which, without a jury, found specially these facts, the propriety of the judgment would be beyond dispute.

It may be doubtful whether the act of February 16, 1875 (18 Stat. 315), is applicable to this case, or, indeed, whether it has not been entirely superseded. The first section of that act required circuit courts, in deciding admiralty cases, to find the facts, and provided that the review in the supreme court upon appeal should be limited to a determination of questions of law arising upon the record. It relieved the supreme court from the consideration of any mere questions of fact. The E. A. Packer, 140 U. S. 360, 11 Sup. Ct. 794; The City of New York, 147 U. S. 72, 76, 13 Sup. Ct. 211, and cases cited in the opinion. In favor of the contention that it is applicable to

the present case, and limits the extent of our inquiry, are the decision in Re Cooper, 143 U. S. 472, 511, 12 Sup. Ct. 453, in which it was held applicable to a case coming from the district court of Alaska, on the ground that that court was one exercising the powers of a circuit court, and the fact that the act of 1891, creating courts of appeals (26 Stat. 826), provides, in section 11, that "all provisions of law now in force regulating the methods and system of review, through appeals or writs of error, shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the circuit courts of appeals." The purpose of the act of 1891 was to distribute between the supreme court and the newly-formed courts of appeals the entire appellate jurisdiction from the circuit and district courts of the United States, and not to provide new methods of procedure. McLish v. Roff, 141 U. S. 661, 12 Sup. Ct. 118; Lau Ow Bew v. U. S., 144 U. S. 47, 12 Sup. Ct. 517; American Const. Co. v. Jacksonville Ry. Co., 148 U. S. 372, 13 Sup. Ct. 758. Also, by section 14 of the act of 1891, section 3 of the act of 1875 was expressly repealed, and it is worthy of consideration whether, the attention of congress having been called to the act of 1875, as shown by the repeal of the third section, it can fairly be assumed that it intended to repeal by implication either of the other sections. On the other hand, it must be noticed that the act of 1875 does not, in terms, apply to the present case, for that simply directed the circuit courts sitting as courts of admiralty to find the facts, and did not name the district courts. The courts of appeals in the First, Second, and Ninth circuits, have expressed the opinion that the act of 1875 does not apply to admiralty cases appealed from the district court to the court of appeals. The Philadelphian, 21 U. S. App. 90, 9 C. C. A. 54, and 60 Fed. 423; The Havilah, 1 U. S. App. 1, 1 C. C. A. 77, and 48 Fed. 684; The State of California, 7 U. S. App. 20, 1 C. C. A. 224, and 49 Fed. 172. But it is unnecessary to definitely determine this question, for an examination of the testimony convinces us that there is no satisfactory reason for disturbing the findings. It must be remembered, also, in this connection, that the court of appeal stands, in respect to admiralty cases at least, not in the old relation of the circuit to the district courts, but rather in that of the supreme to the circuit courts, and any case brought to this court from either the circuit or district court comes here for review, rather than for trial, and whatever limitations or qualifications may be applicable to admiralty cases do not abridge the important fact that this is a reviewing and appellate tribunal. The Mabey, 10 Wall. 419.

It is contended, in the first place, that the finding of the court that there was an unreasonable detention cannot be sustained, because it appears that there were no public docks at the port of Duluth with capacity sufficient to receive and support this cargo, and equipped with coal-discharging machinery, and that to have made arrangements for discharging the cargo at one of those docks would have taken from eight to twelve days; that, including the dock of claimant, there were but five private docks, and that no one of them would have taken and received the coal for storage; that, as the cargo

was in fact discharged within eight days after its arrival, it was discharged as soon as it could have been at any public dock. But this contention overlooks the fact that the contract of shipment as shown in the bill of lading was for delivery to the claimant, and not generally for delivery at the port of Duluth; that, though the contract was not made with the claimant, but with the owners of the cargo, yet in making such contract and fixing the price of carriage the libelants, as owners of the boat, may well be presumed to have taken into consideration the exact place and conveniences for unloading, and the time which naturally would be occupied in so doing. If the contract had been for shipping generally to the port of Duluth, the conditions of delivery at the public docks would doubtless have to be taken into consideration; but when the shipment is to a particular party having known, special conveniences for unloading, that fact enters into the contract, and determines the question of reasonableness in the discharge of the cargo. The steamer contracted with the owners to take their coal and deliver it to the claimant at Duluth, "free of handling." It knew what conveniences the claimant had for unloading. It knew the time which would reasonably be occupied in unloading at the claimant's dock, and with that knowledge it contracted for a certain price of carriage. It had a right to expect that the owners would see that arrangement was made with the claimant for receiving and unloading the cargo, and, if they failed to make such arrangement, and there was, consequently, a longer detention than was reasonably necessary for unloading at claimant's dock, it was entitled to demurrage.

These considerations also obviate any objections that are suggested by reason of the fact that claimant did not own the coal, that it had made no contract with the boat, and that it was under no obligation to the owners of the coal to accept and discharge the steamer of its cargo. The demurrage insisted upon is not a personal claim against the Pioneer Fuel Company for a breach of its contract, but arises out of the breach of the contract made with the owners of the coal for whom the carriage was undertaken. The vessel had nothing to do with the question of the ownership of the coal, or any contract made or to be made in reference to a sale. It did not contract to carry the coal to Duluth, and hold it there while the owners should make arrangements for a sale. Its contract was to carry and deliver it to the claimant, the Pioneer Fuel Company, and, of course, impliedly, at its dock, where it was in the habit of receiving such shipments. It had no right to know (and, as a matter of fact, did not know) whether the coal had been sold to the claimant, or whether it was to be received by the claimant for purposes of sale. Those were matters between the claimant (the consignee) on the one hand, and the shippers (the owners) on the other. The contract was one of carriage free of handling; that is, the shippers were to see to the matter of loading and unloading. It was a duty resting upon them, and any failure on their part to promptly discharge this duty gave to the boat a right to recover damages. It would be strange, indeed, if, making a contract like this to carry a cargo free of handling, a steamer could be compelled to

hold that cargo, and remain in the port of delivery, waiting until such time as the owners could make with the consignee or with others suitable arrangements for the sale of the cargo. It is true, the vessel was sunk in transit, and the cargo was somewhat damaged by water, but it was expressly stipulated in the bill of lading that the dangers of navigation were excepted. There was nothing in the condition of the coal after the sinking, or after its arrival, to interfere with the prompt delivery; and the delay in unloading was not at all caused by any difficulty in unloading or lack of conveniences therefor, or want of place to store the coal, but simply because of the fact that the claimant, the consignee, finding the coal damaged, entered into negotiations with the owners for a purchase at a reduced price. The delay was wholly at the instance of the owners and the consignee, for their benefit, and not at all at the instance or for the benefit of the vessel.

It is further claimed that these damages are not recoverable, because when the claimant finally purchased the coal it notified the master of the vessel that it would not be responsible for freight or demurrage. It subsequently agreed to advance the freight, and, after this action was commenced, did so. But a notice of this kind did not affect the claim for demurrage. Whatever arrangements might be made between the consignee and the owners, whether for a purchase by the consignee at a fixed price or even for a donation by the owners to the consignee, are immaterial, so far as the claim of the vessel for demurrage is concerned. And this claim is not at all interfered with although full notice is given to the master of the vessel of the terms and conditions of the contract between the owners of the cargo and the consignee.

It is also insisted that the vessel consented to the delay, and waived any claim for demurrage; but this is a mistake. On the 27th of July the master of the vessel served a written notice upon the claimant that the cargo had been ready for delivery ever since July 24th at 7 a. m., and that the vessel would look to the cargo for demurrage at the rate of $200 per day, beginning July 24th; and one of the owners of the boat also gave personal notice to the same effect. It is true that the agent of the boat at Duluth was aware of negotiations looking to a sale of the coal to the claimant, and took some part in assisting in those negotiations; but, in the face of the written and verbal notices given by the master and one of the owners of the vessel, it cannot be held that there was any waiver of the right to demurrage.

Finally, it is said that the lien was lost because the cargo was in fact delivered, but the rule is settled that the mere unloading of a cargo does not discharge the lien. That may be only a conditional delivery, and, unless there be circumstances to show an abandonment of the lien, as where other security is taken, or unless the cargo when delivered is so mixed with other goods as to be incapable of separation and identification, the lien will continue. In this case it appears that there was distinct notice from the vessel to the claimant that the lien on the cargo would be insisted upon, and the coal, when unloaded, was placed in a pile by itself, and so situated with

respect to other coal on the dock as to be identified and removed without disturbance of the other coal. In such cases it is clear that the lien has not been waived by the mere fact that the goods have been unloaded from the vessel and placed upon the dock. Bags of Linseed, 1 Black, 108, 114; 151 Tons of Coal, 4 Blatchf. 368, Fed. Cas. No. 10,520; 600 Tons of Iron Ore, 9 Fed. 595; Costello v. 734,-700 Laths, etc., 44 Fed. 105; Cuff v. 95 Tons of Coal, 46 Fed. 670.

It is claimed by the libelants that the amount of demurrage allowed was not sufficient, and they insist that, although they took no appeal from the decree, the appeal on the part of the claimant brings the whole case into this court for a rehearing, and upon the facts as presented this court is at liberty to increase the amount of the award, —citing Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, in which it was held by the supreme court that such was the rule on an appeal from the district to the circuit court. But the appeal from the district to the circuit court simply transferred the case from one court to another for trial, and it may be questioned whether that rule applies in a case brought to an appellate court for review. But, be that as it may, we do not find in the testimony sufficient to justify us in disturbing the conclusions of the district court in this respect. The fact of damage, and the actual amount thereof, must be clearly shown. The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510; Empire Transp. Co. v. Philadelphia & R. Coal & Iron Co., 40 U. S. App. 157, 23 C. C. A. 564; and 77 Fed. 919, and cases cited in the opinion. Upon a careful examination of the testimony we are not satisfied that we should be justified, even if we had the authority, in disturbing the conclusions reached by the trial court.

These are all the questions we deem worthy of consideration. Upon the record, as it stands, we find no error calling for a reversal or modification, and the decree of the district court is affirmed.