EASTERN S. S. CO. v. 170,040 ⁵⁰/₆₀ BUSH-
ELS OF WHEAT, etc.

PIONEER S. S. CO. v. 92,680 BUSHELS OF
WHEAT, etc.

(District Court, W. D. New York.　July 26, 1924.)

Nos. 1247, 1248.

**1. Shipping ⬥106—Nature of bills of lading stated.**

　Bills of lading, embodying contract of transportation by water, are negotiable instruments, and import title of the specified commodity, and right of transfer or assignment.

**2. Shipping ⬥120—Vessel liable for injuries caused by violation of bill of lading.**

　Vessel is liable for injury caused by violation of conditions contained in bill of lading binding on vessel.

**3. Shipping ⬥126—Vessel may assume that unloading will occur without unusual delay.**

　Ordinarily vessel may assume that goods will be accepted by care party on arrival, pursuant to arrangements between care party or owner or shipper, and generally that unloading will occur without unusual delay or detention, unless extraordinary conditions intervene.

**4. Evidence ⊜407(1)—Contract of affreightment cannot be explained by parol.**

Contract of affreightment cannot be explained by parol, unless question of good faith becomes important, or receipt is question involved.

**5. Customs and usages ⊜19(3)—Evidence held to prove custom as to naming care parties.**

Evidence *held* to prove custom of port, pursuant to which care parties were named in bills of lading by prior arrangement with grain owner, either before loading, or, when no nomination is made in billing, before or at time of arrival in port.

**6. Shipping ⊜177—Cargo held liable for demurrage, though no negligence and no demurrage clause.**

Cargo *held* liable for demurrage on delay in unloading, where care party was named, though delay was caused by congestion at port, and though bill of lading contained no demurrage clause.

In Admiralty. Libels for demurrage by the Eastern Steamship Company against 170,040$^{5}$%₀ bushels of wheat ex cargo steamer Joseph Wood, and by the Pioneer Steamship Company against 92,680 bushels of wheat ex cargo steamship James P. Walsh. Decrees for libelants.

Goulder, White & Garry, of Cleveland, Ohio, and Thomas C. Burke, of Buffalo, N. Y. (Thomas H. Garry, of Cleveland, Ohio, of counsel), for libelant Eastern S. S. Co.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, and Thomas C. Burke, of Buffalo, N. Y. (Fred L. Leckie, of Cleveland, Ohio, of counsel), for libelant Pioneer S. S. Co.

Stanley & Gidley, of Buffalo, N. Y. (Ray M. Stanley and Ellis H Gidley, both of Buffalo, N. Y., of counsel), for respondents.

HAZEL, District Judge. The above-entitled actions in rem, being similar as to material matters, were tried together by consent of the parties. They were brought by the owners of lake steamers James P. Walsh and Joseph Wood against cargoes of grain, to recover damages for detention and delay in unloading at elevators in Buffalo in the month of October, 1922. The libels substantially allege that the cargo owners designated a care party in the bill of lading and failed to arrange with him for unloading at any elevator with reasonable dispatch on arrival of the steamers in port, and within the terms of the bill of lading under which the cargoes were accepted. The grain was loaded aboard the steamers at Ft. William and Port Arthur, on October 9th and 10th, respectively.

The evidence shows that one Scott, a vessel charterer at Cleveland, entered into a verbal arrangement with the local agent of the M. A. Hanna Company, manager of lake steamers, for charter of a steamer to load grain during the first 10 days of October, 1922, the cargo to be consigned "in care of Douglas, Buffalo." This arrangement was subsequently confirmed in writing. Douglas, as care party, was suggested by the agent of the steamship, owing to the fact that at this time there was slow unloading of boats at Buffalo, but Douglas consignments, it was believed, would be promptly unloaded. The steamer Wood was later designated as the carrying vessel, and on October 8th she took aboard various cargoes of grain at Ft. William for transportation to Buffalo. It appears that the charterer, Scott, had business connections with the Tomlinson Company, of which one Spendlove was agent at Winnipeg, and who was notified of the charter, and later that the steamer Wood had been selected. On September 19th, before the steamer Wood was named, Spendlove agreed to supply space for the transportation of 100,000 bushels of grain to Buffalo for Parrish & Heimbecker, and 200,000 bushels for the Globe Grain Company, Limited. On October 4th he agreed to transport 70,000 bushels of grain sold by the latter to Milmine, Bodman & Co., on the steamer Wood, and also the 100,000 bushels belonging to Parrish & Heimbecker. The balance of the space he assigned to James Richardson & Sons for the transportation of 186,000 bushels.

In these various shipments it was definitely understood that the grain must be consigned to the care of Douglas. Upon this point Heimbecker testified that he went to Spendlove's office and asked for grain space to Buffalo, and Spendlove replied that he would give him some; that he could give him space on consignment to Douglas as care party, and that a short time later he returned to Spendlove's office and said, "I will accept that," and the arrangement (Exhibit C) was later confirmed. The Parrish & Heimbecker shipment had been sold to C. F. & G. W. Eddy, Inc., of Boston, and the sales slip refers to Douglas as care party. Bills of lading were issued during the progress of the loading, after notification as required by customs, to to the Lake Shippers' Clearance Association. When the vessel arrived at Buffalo, her entire cargo of grain owned by different parties was in condition for unloading. The Parrish & Heimbecker grain, the Milmine-Bodman grain, and 10,000 bushels consigned to Richardson were contained in holds 1 and 4, while 175,740 bushels for Richardson were

in holds 2 and 3. While the carrying vessel was en route, Douglas was notified of the consignment, and Parrish & Heimbecker and Milmine, Bodman & Co. were immediately notified that the shipments would not be received by him, and subsequently unloading at the elevator docks under his management was refused; but the Richardson consignment was accepted, and quantities in hold 4 were promptly unloaded, while the grain contained in holds 2 and 3 was only partially unloaded, since the safety of the vessel required unloading the Parrish & Heimbecker and Milmine-Bodman grain before unloading the balance. Accordingly the vessel was taken to another dock and arrangement made with the Williamson Forwarding Company to become care party for the Parrish & Heimbecker and Milmine grain, although unloading was not possible until October 23d, a delay of 7 or 8 days. Thereafter the steamer Wood was again taken to the Douglas elevator to complete unloading of the Richardson grain.

The steamer Walsh was loaded on October 10, 1920, as already mentioned, and in addition to the Chesapeake Export Company grain (92,680 bushels) shipped care "E. T. Douglas Eastern Grain & Elevator Company, Buffalo," by Smith, Murphy & Co., had aboard grain for Hansen, Richardson & Nye, and Jenks & Co., consigned to E. T. Douglas as care party. Douglas, on learning that the Chesapeake Export Company consignment was to him, gave notice that he would not act as care party or receive the grain for unloading, and the carrying vessel was afterwards unloaded by the Western Elevating Association on October 25th, a delay of 7¾ days. We are not concerned herein with the refusal by Douglas to unload the Milmine, Bodman & Co. consignment aboard the steamer Wood, as the difference arising from the vessel's detention has been adjusted by the parties.

The testimony is therefore confined to the asserted liability of the owners of the grain on consignments to Douglas arising from the Parrish & Heimbecker shipment on the steamer Wood and the Chesapeake Export Company shipment on the steamer Walsh. The defenses are numerous. In the main they consist of a denial of liability because of an extraordinary congestion in unloading at the port, resulting in unavoidable delay in unloading, a condition that was generally known to transporters of grain on the Great Lakes; that a large number of vessels were awaiting unloading in their turn at the time the steamers Wood and Walsh arrived, and according to the custom of the port they were entitled to be unloaded in their turn; that the bills of lading in issue contained no demurrage clause, and hence unloading within a reasonable time was the only requirement. Respondents also assert in defense that representations were made at the time of the several shipments of such a character as to induce the selection of Douglas as care party by the owners of the grain, and therefore no lien for detention exists, and furthermore that the refusal of the care party to act was in derogation of the established custom of the port.

[1-4] It should be borne in mind at the outset that the respective charters expressly stipulated that Douglas, who was in charge of elevators at Buffalo, must be care party as a condition precedent to taking aboard the grain, which implied, as the parties plainly understood, that unloading at one of the elevators coming under his management would occur with reasonable promptitude. The evidence does not show, as contended by respondents, that the agents of the two carrying steamers would themselves arrange with Douglas to act as care party. The bills of lading embodied the contract of transportation by water, and by their terms the carrying vessels agreed to rightly deliver the grain entrusted to them, in good order and condition, to the specified care party, and in accordance with custom and usage of commerce. Devato v. Eight Hundred Barrels, etc. (D. C.) 20 Fed. 510. Bills of lading are negotiable instruments and import title of the specified commodity and a right to transfer or assign the same from one to another, and the vessel, for violation of conditions binding upon her, is liable for the injury sustained. The Esrom (C. C. A.) 262 Fed. 953; Ottawa Transit Co. v. 261,000 Bushels of Wheat (D. C.) 260 Fed. 493. Ordinarily she may assume the property transported by her will be accepted by the care party on arrival pursuant to arrangements between the latter or the owner or shipper, and generally that unloading will occur without unusual delay or detention unless extraordinary conditions intervene. Williscroft v. Cyrenian (D. C.) 123 Fed. 169; The Esrom, supra; G. A. Tomlinson (D. C.) 293 Fed. 51. There was nothing to bind the grain to the steamer nor the steamer to the grain until the cargo was laden on board and the bill of lading issued and the care party nominated or the place of right delivery specified. Such instrument, a

contract of affreightment, cannot be explained by parol, unless the question of good faith becomes important or the receipt is the question involved. The Lady Franklin, 8 Wall, 325, 19 L. Ed. 455.

Coming now to the defenses, respondent urges in argument that in the year 1915 it was the custom of the port to assign elevators to vessels for unloading in turn of their arrival, regardless of the care party or owner of the grain, and this custom, in view of the circumstances, should govern the disposition of this case. It is true that in Acme Transit Co. v. 133,000 Bushels of Wheat, 243 Fed. 970, this court held that the vessel assumed certain risks of prompt unloading near the close of navigation, or in an emergency at the port of unloading, arising out of the European war conditions, and that both the carrier and shipper or owner of the cargo were required to exercise reasonable care and precaution to prevent delay, and it was held that the evidence was insufficient to establish negligent delay on the part of the cargo owner, and that the loss sustained by the delay in unloading was attributable solely to the vessel in accepting a cargo for a known overcrowded port. That case, however, because of essentially different facts, is not controlling here.

Much testimony, some of it contradictory, was adduced as to the prevailing custom of the port relating to nomination of care party and unloading vessels in turn of arrival. Respondent contends that the general custom of the port was for the owner of the grain to nominate a care party, who, without prearrangement or special agreement, accepted the grain on its arrival in port, and unloaded the vessel at an elevator under his control, or, if space were lacking, at any other available elevator which customarily would accept the shipment and unload in turn. Whatever the custom of the port is, or may have been, in this relation, whether there existed "open port," or whether the "notify party" (owner of grain) named in the bill of lading had or had not the right to name the care party, without arranging with him to act in advance of arrival, are severally questions which are not of controlling importance, unless it is found from the proofs that the agents or representatives of the steamships unduly insisted that Douglas be named as care party, and by their insistence accepted responsibility for prompt unloading. Riley v. A Cargo of Iron Pipe (D. C.) 40 Fed. 605. The refusal of Douglas, however, to accept the grain I find is not attributable in any sense to the carrying vessel. He was not the

1 F.(2d)—36

agent of either the steamer Walsh or the steamer Wood, and the agents of the boats were not acting for Douglas or any elevator represented by him. There was no understanding, express or implied, that they, or either boat, should solicit Douglas consignments.

[5] Assuming it necessary to determine what the prevailing custom of the port was in 1922 as to the nomination of a care party, I think that the weight of the testimony would require me to hold that, since the dissolution of the Western Elevating Association in 1916 and the separation of certain elevators (but not the Grammer-Douglas elevators, which are operating independently) into groups for their benefit, the care parties are commonly included in the bills of lading by prior arrangement with the grain owner, either before loading aboard the steamer or, when no nomination is made in the billing, before or at the time of arrival in port. It is not always an express prearrangement as to separate shipments, but an implied understanding, from the fact that the owner or shipper is regarded as a customer either of a certain care party or of a certain elevator or elevators. As the witness Smith, for respondent, who has had long experience in such matters, has testified:

"Exporters in New York have certain men who work for them as care parties in Buffalo. They don't make specific arrangements for each cargo. They have a general running arrangement by which they say to a man in Buffalo: 'Our cargo, or some of our cargo, goes to you.' And the first the care party knows in this matter is when he gets notice from the vessel agent that a certain parcel of grain is consigned in his care. But it is for a usual customer. That is the real practice.

"By the Court: Q. Supposing I was a shipper of grain, and I was not a regular customer of a regular care party at Buffalo, would it be necessary that I should communicate with the care party stationed at Buffalo before I specified or nominated a care party in the bill of lading? A. Not absolutely necessary.

"Q. What is the custom in relation to that? A. You usually would.

"Q. You usually prearrange by communicating with a care party and requesting him to act as care party? A. Writing him and requesting him to act as care party.
* * *

"By the Court: Q. So it is really up to the care party as to whether he wants to act as such? A. Yes; the care party being a

trustee, he cannot be made to act, he can act or not, as he chooses."

[6] In my view of the facts the principle announced by Judge Brewer in Pioneer Fuel Co. v. McBrier, 84 Fed. 495, 28 C. C. A. 466, may appropriately be applied. In that case a cargo of coal was delivered "free of handling" at the private dock of a consignee at Duluth, who it was known had special facilities for unloading vessels, and, though there was unnecessary delay and detention without fault of the cargo owner, the court held the cargo liable for demurrage. In answer to the contention of the cargo owner that there was no unreasonable detention, because there were not public docks at Duluth with sufficient capacity to receive the cargo, the learned court said:

"But this contention overlooks the fact that the contract of shipment as shown in the bill of lading was for delivery to the claimant, and not generally for delivery at the port of Duluth; · that, though the contract was not made with the claimant, but with the owners of the cargo, yet in making such contract and fixing the price of carriage the libelants, as owners of the boat, may well be presumed to have taken into consideration the exact place and conveniences for unloading, and the time which naturally would be occupied in so doing. If the contract had been for shipping generally to the port of Duluth, the conditions of delivery at the public docks would doubtless have to be taken into consideration; but when the shipment is to a particular party, having known special conveniences for unloading, that fact enters into the contract, and determines the question of reasonableness in the discharge of the cargo. The· steamer contracted with the owners to take their coal and deliver it to the claimant at Duluth, 'free of handling.' It knew what conveniences the claimant had for unloading. It knew the time which would reasonably be occupied in unloading at the claimant's dock, and with that knowledge it contracted for a certain price of carriage. It had a right to expect that the owners would see that arrangement was made with the claimant for receiving and unloading the cargo, and, if they failed to make such arrangement, and there was, consequently, a longer detention than was reasonably necessary for unloading at claimant's dock, it was entitled to demurrage."

See, also, Lehigh Valley Coal Co. v. Ionia Transp. Co., 174 Fed. 798, 98 C. C. A. 506, and Inter-Coast S. S. v. Seaboard Transp. Co. (C. C. A.) 291 Fed. 13.

The carrying vessels were not required to concern themselves either about the owner of the grain or the care party. The contracts of carriage were entered into because the agent of the vessels knew that Douglas had facilities and conveniences for expeditious unloading, and, indeed, that he was in a condition so to do when another care party at Buffalo was not. This fact undoubtedly entered into the arrangement under which the cargo was accepted for transportation. The several billings, together with confirmatory letters of prior conversations, and the evidence, support this view. Upon this point respondent attaches importance to the testimony of Hall, and argues therefrom that the consent of the Standard Steamship Company to modify the original charter with Hutchinson & Co. nullified the custom of the port and took away the grain owner's right to name the care party  But the argument is unpersuasive. Douglas' violation of an established custom of the port in not acting as care party is not of material importance. The carriers should not suffer loss because of his refusal to act as care party for the shipments in question. The relations, arising from the bills of lading, between the carriers and the grain owners, were not such as to warrant recovery from the care party for its failure to act. N. Y. C. R. R. Co. v. Ross Lumber Co., 234 N. Y. 261, 137 N. E. 324, 24 A. L. R. 1160. It is also respondents' contention on this point that the Pioneer Steamship Company broke its original contract of August 30, 1922, with the Standard Shipping Company for loading grain during the first half of October, and, to avoid liability for the breach, substituted the steamer Walsh for an unnamed steamer of the Payne & Stanton type, and required consignment to Douglas as a condition of performance. But this contention is not sustained by the evidence.

There is also testimony of a contract between the Standard Shipping Company and Smith, Murphy & Co. for tonnage for 20,000 bushels of grain between October 20th and 30th, and reference is made to a contract between Smith, Murphy & Co. and the Chesapeake Export Company for transportation of 200,000 bushels of wheat between 1st and 15th. But in my opinion these are matters of no particular bearing upon the steamship's right to recover for unreasonable detention of the vessels; nor was the testimony relating to letters or telegrams between Douglas and Eddy, Inc., or communications passing between the shippers and owners of

the grain, of relevancy, since the carriers were not parties thereto.

It is next contended that the claim for demurrage cannot be sustained, since the bill of lading contains no demurrage clause, and no negligence has been shown on the part of the charterer. When no lay-days are stipulated, it is implied that the cargo will be unloaded within a reasonable time, and the burden of proof as to negligent failure to comply rests upon the libelant. But this principle does not apply to this case. If the bill of lading had not actually specified the care party, which was tantamount to specifying the particular place of unloading, this rule might have application. But, as heretofore pointed out, and as said in Pioneer Fuel Co. v. McBrier, supra: "When the shipment is to a particular party, having known special conveniences for unloading, that fact enters into the contract, and determines the question of reasonableness in the discharge of the cargo."

Loss and damage concededly was sustained by the carriers for the failure of the designated care party to unload the vessels at an elevator under his control and in turn of arrival, and accordingly the cargo must be made to pay, and it makes no difference that the steamers went to another elevator in port where they were unloaded in turn.

Other defenses and arguments in support thereof have been fully considered by me, but in my opinion libelants are entitled to a decree, with costs.