**4,885 BAGS OF LINSEED—** *Wills, Claimant; Sears, Libellant.*

1. A vessel was chartered for a voyage from Boston to Calcutta and back, and the agents of the charterers at Calcutta sub-chartered her to other persons there, who loaded her with goods consigned to parties in Boston, under special bills of lading, which did not refer to the original charter party: *Held,* that the rights of the ship-owners to the freight, payable by the consignees, and their lien for it upon the goods, depended entirely on the contract expressed in the bills of lading, and not upon anything contained in the charter party.

2. The lien of a ship-owner for freight being but a right to retain the goods until payment of the freight, is inseparably associated with the possession of the goods, and is lost by an unconditional delivery to the consignee.

3. But if the cargo is placed in the hands of the consignee, with an understanding that the lien for freight is to continue, a court of admiralty will regard the transaction as a deposit of the goods in the warehouse, and not as an absolute delivery, and on that ground will consider the ship-owner as being still constructively in possession so far as to preserve his lien.

4. That such an understanding did exist between the parties must appear in the evidence, or be plainly inferable from the established local usage of the port, otherwise there is no possession, actual or constructive, to support the lien.

Appeal from the decree of the Circuit Court of the United States for the district of Massachusetts.

The libel in this case was filed in the District Court by Paul Sears, Reuben Hopkins, James Smith, Alexander Child, William N. Batson, and Rowland H. Crosby, owners of the ship Bold Hunter, against four thousand eight hundred and eighty-five bags of linseed, seven thousand pockets of linseed, and fifteen hundred and thirty bags of pegue cutch. The goods libelled were part of a larger quantity brought to Boston from Calcutta by the Bold Hunter for Augustine Wills, and were at the time in store. The libellants demanded $14,948 57 as freight, less $5,000, which had been paid on account; and for

this balance of freight they insisted .that their lien had not been waived or impaired by the delivery of the goods under the circumstances.

After warrant and monition were issued, and the goods seized by the marshal in pursuance thereof, Rufus Wills, administrator of Augustine Wills, deceased, came in as claimant, and made answer to the libel, denying that the. libellants had any lien on the goods for the freight.

The parties did not dispute about the facts of the case. It appeared by their mutual admissions that the libellants were owners of the Bold Hunter, and, in October, 1856, chartered her to Tuckerman, Townsend & Co. for a voyage from Calcutta to Boston, at $15 per ton on whole packages, and half that rate on loose stowage. The charter party contained the usual lien clause, with a stipulation that the freight should be paid in five and ten days after discharge at Boston, the credit not to impair the ship-owner's lien for freight. On the ship's arrival at Calcutta, the charterers did not furnish an entire cargo, and procured some shipments on freights—among others, one to Augustine Wills—for which the master signed bills of lading, in the usual form, at various rates of freight, all less than the charter rates. These bills of lading were passed over to the libellants by Tuckerman, Townsend & Co. in part settlement of the charter money, and the libellants undertook to collect. the freights. The ship arrived at Boston in October, 1857. The larger portion of the goods consigned to Wills were discharged by the consent of all parties, without being landed, into the ship Cyclone, bound to London, and the remainder. were delivered to the claimant, who took them to the custom-house stores, and entered them in bond in the name of Augustine Wills. When the Bold Hunter arrived, Augustine Wills, the consignee, was sick, and he died before the goods were all discharged. Rufus Wills, the claimant, acted as his agent before his death, and was his administrator afterwards. The goods were discharged and delivered without qualification, and nothing was said about holding them or any part of them for freight. The claimant, before the death of the consignee, paid $5,000 on the freights, but afterwards declined to pay any

---

---

more, saying that he did not know how the estate of Augustine Wills would turn out.

The District Court dismissed the libel, and the decree was afterwards affirmed by the Circuit Court. Whereupon the libellant took this appeal to the Supreme Court of the United States.

*Mr. C. G. Loring*, for the libellants.

1. The ship-owner has a lien on the goods, which is independent of possession, and not necessarily lost by delivery to the debtor. This lien does not imply a right of property, but the privilege of resorting to the thing for payment, in preference to general creditors. *The Volunteer*, (1 Sumn., 551;) *Logs of Mahogany*, (2 Sumn., 603;) *Raymond & Tyson*, (17 How., 53;) Valin Com. on Code, art. 24; 2 Boulay Paty Com. on Code, 479; Abbot on Shipping, 127, 284; *The Freeman*, (18 How., 188;) *The Yankee Blade*, (19 How., 90;) *Dupont de Nemours* vs. *Vance*, (19 How., 171.) Waiver of the lien cannot be inferred from the fact that a portion of the cargo was at the request of the claimant discharged into another vessel to be carried to London. The libellants had a right to resort to that which remained in store at Boston for payment of their freight upon the whole. Abbot on Shipping, 377; Ang. on Car., 360; *Soddergreen* vs. *Flight*, (6 East., 422;) *Boggs* vs. *Martin*, (1 B. Monr., 239;) *Bernal* vs. *Prin*, (1 Gale, 17.) There being a stipulation in the charter party that the credit to be given for the freight should not impair the lien, that instrument does not receive its proper meaning unless the lien follows the goods into the hands of the consignee. It does follow them, subject only to the agreement of the ship-owner that he will not enforce it for a few days.

2. The admiralty jurisdiction is the "chancery of the seas," and gives relief wherever a court of equity would do so in a similar case. In equity an agreement for a lien binds the thing and creates a trust as between the parties. *Fletcher* vs. *Morey*, (2 Story, 565.) The consignee, if not an immediate party to this contract, (the charter party,) knew of it, claimed the credit under it, and cannot allege that the lien of the libel-

lants was lost by delivery. The lien may be enforced against him without regard to the possession. *Collyer* vs. *Fuller*, (1 Turn. & Rup., 469;) *Alexander* vs. *Heriot*, (1 Bailey Ch., 223;) *Read* vs. *Hill*, (2 Dessau, 552;) *Dow* vs. *Ker*, (Spear's Ch. R., 413.)

3. Even if this case be adjudged by the rules of the common law, it is with the libellants, for the courts of common law will give effect to the intentions of the parties. *Small* vs. *Moates* (9 Bing., 574;) *Wilson* vs. *Kymer*, (1 Maule & Selwyn, 167;) *Bigelow* vs. *Heaton*, (6 Hill, 43;) S. C., 4 Denio, 496; *Dodsley* vs. *Varley*, (12 Ad. & Ell., 632;) *Hussey* vs. *Thornton*, (4 Mass., 405.)

*Mr. S. W. Bates*, of Massachusetts, (with whom were Messrs. *Story* and *May*,) for the claimant, contended that the lien for freight was lost by the delivery; that the libellants stand upon the same footing with other creditors, and are left to their remedy *in personam.*

1. The carrier's lien for freight is a right to hold, not a right to take. It begins with, rests upon, and ends with, the possession. Delivery has always been held a waiver, or rather an abandonment, of the right.

2. Augustine Wills, whom the claimant represents, was no party to the agreement made by Tuckerman & Co. with the ship-owners. He could have known nothing about it. He did not know upon what vessel the goods were shipped until they arrived at Boston. A sub-freighter or consignee is not bound by the charter party, his bill of lading not referring to it. Abbot on Shipping, 6th ed., 287–8; *Paul* vs. *Birch*, (2 Atk., 621;) *Mitchell* vs. *Scaife*, (2 Camp., 298;) *Faith* vs. *E. Ind. Co.*, (4 B. & A., 630;) *Shepard* vs. *De Bernales*, (13 East., 570.)

3. The libellants say that the maritime law is derived from the civil law, and the civil law gave a privilege to carriers which did not depend upon possession, and was not lost by alienation. This confounds the common law lien of carriers with the carriers' *privilegium* under the civil law. They are different things. The privilege of the civil law did not depend upon possession, because the carrier had no right to re-

tain possession. It was a mere preference over other creditors. But by the common law the carrier may keep the goods until the freight is paid; so he may by the maritime law; and under both systems, for the same reason, his lien is gone when he parts with the goods. *Parker* vs. *Hill*, (2 Wood & Minot, 106;). *Raymond* vs. *Tyson*, (17 How., 53;) Parson's Merc. Law, 345. Some maritime liens are like the *privilegium* of the civil law; for instance, a lien for supplies or materials which may be enforced by one who never was in possession. *Van Bokelyn* vs. *Ingersoll*, (5 Wend., 315.) But not so of liens like this.

Mr. Chief Justice TANEY. The rights of the parties in this case depend altogether on the contract created by the bill of lading. That instrument does not refer to the charter party, nor can the charter party influence in any degree the decision of the question before us. Augustine Wills was not a party to it, and it is not material to inquire whether he did or did not know of its existence and contents; for there is nothing in it to prevent Wills & Co., the sub-charterers, or Augustine Wills, the consignee, from entering into the separate and distinct contract stated in the bill of lading, and the assignees took the rights of Wills & Co. in this contract, and nothing more. The circumstance that it came to hands of the ship-owners by assignment from the sub-charterers, who knew and were bound by all the stipulations of the charter party, cannot alter the construction of the bill of lading, nor affect the rights or obligations of Augustine Wills.

Undoubtedly the ship-owner has a right to retain the goods until the freight is paid, and has, therefore, a lien upon them for the amount; and, as contracts of affreightment are regarded by the courts of the United States as maritime contracts, over which the courts of admiralty have jurisdiction, the ship-owner may enforce his lien by a proceeding *in rem* in the proper court. But this lien is not in the nature of a hypothecation, which will remain a charge upon the goods after the ship-owner has parted from the possession, but is analogous to the lien given by the common law to the carrier on land, who is not bound to deliver them to the party until his fare is paid;

and if he delivers them, the incumbrances of the lien does not follow them in the hands of the owner or consignee. It is nothing more than the right to withhold the goods, and is inseparably associated with his possession, and dependent upon it.

The lien of the carrier by water for his freight, under the ordinary bill of lading, although it is maritime, yet it stands upon the same ground with the carrier by land, and arises from his right to retain the possession until the freight is paid, and is lost by an unconditional delivery to the consignee. It is suggested in the argument for the appellant, that, as a general rule, maritime liens do not depend on possession of the thing upon which the lien exists; but this proposition cannot be maintained in the courts of admiralty of the United States. And, whatever may be the doctrine in the courts on the continent of Europe, where the civil law is established, it has been decided in this court that the maritime lien for a general average in a case of jettison, and the lien for freight, depend upon the possession of the goods, and arise from the right to retain them until the amount of the lien is paid. *Rae* vs. *Cutler*, (7 How., 729;) *Dupont de Nemours & Co.* vs. *Vance and others*, (19 How., 171.)

In the last mentioned case, the court, speaking of the lien for general average, and referring to the decision of *Rae* vs. *Cutler* on that point, said: "This admits the existence of a lien arising out of the admiralty law, but puts it on the same footing as a maritime lien on cargo for the price of its transportation, which, as is well known, is waived by an authorized delivery without insisting on payment."

After these two decisions, both of which were made upon much deliberation, the law upon this subject must be regarded as settled in the courts of the United States, and it is unnecessary to examine the various authorities which have been cited in the argument. But it may be proper to say, that while this court has never regarded its admiralty authority as restricted to the subjects over which the English courts of admiralty exercised jurisdiction at the time our Constitution was adopted, yet it has never claimed the full extent of admiralty

power which belongs to the courts organized under, and governed altogether by, the principles of the civil law.

But courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. And it often happens that the necessities and usages of trade require that the cargo should pass into the hands of the consignee before he pays the freight. It is the interest of the ship-owner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery. And it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty. The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by the fault of the ship. It is his duty, and not that of the ship-owner, to provide a suitable and safe place on shore in which they may be stored; and several days are often consumed in unloading and storing the cargo of a large merchant vessel. And if the cargo cannot be unladen and placed in the warehouse of the consignee, without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the ship-owner and the merchant.

It is true, that such a delivery, without any condition or qualification annexed, would be a waiver of the lien; because, as we have already said, the lien is but an incident to the possession, with the right to retain. But in cases of the kind above mentioned it is frequently, perhaps more usually, understood between the parties, that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and that the ship-owner reserves the right to proceed *in rem* to enforce it, if the freight is not paid. And if it appears by the evidence that such an understanding did exist between

the parties, before or at the time the cargo was placed in the hands of the consignee, or if such an understanding is plainly to be inferred from the established local usage of the port, a court of admiralty will regard the transaction as a deposit of the goods, for the time, in the warehouse, and not as an absolute delivery; and, on that ground, will consider the ship-owner as still constructively in possession, so far as to preserve his lien and his remedy *in rem.*

But in the case before us, there is nothing from which such an inference can be drawn. The goods were delivered, it is admitted, generally, and without any condition or qualification. Upon such a delivery there could be neither actual nor constructive possession remaining in the ship-owner; and, consequently, there could be no right of retainer to support his lien.

The decree of the Circuit Court, dismissing the libel, must therefore be affirmed.

*Decree affirmed.*