## COSTELLO *v.* 734,700 LATHS, etc.[1]

*(District Court, E. D. New York. November 10, 1890.)*

1. MARITIME LIENS — LIEN FOR FREIGHT — DELIVERY OF CARGO — WHEN LIEN NOT LOST.

A ship-master discharged a cargo of laths, according to the direction of the consignee named in the bill of lading, which were received and piled in the yard of the purchaser, about 300 feet from the vessel. After the completion of the discharge, demand was made for the freight, but, owing to disputes as to the amount, the purchaser refused to pay the freight called for by the bill of lading. The master immediately served notice that his lien for freight had never been abandoned, and afterwards seized the cargo under process in this suit. *Held*, that the lien had not been abandoned.

2. BILL OF LADING—CONFLICTING COPIES—MASTER'S COPY.

A bill of lading calling for 55 cents freight per thousand laths was delivered to the master of a vessel at Montreal, under which the voyage was performed. A bill of lading had been sent by the shipper to the consignee, which stated the freight at 50 cents per thousand. *Held*, that the bill of lading first executed and delivered to the master, and under which the voyage was performed, was the contract binding on the parties and the cargo.

3. DELIVERY OF CARGO—EXPENSE OF PILING CARGO.

A vessel cannot be charged with the expense of piling her cargo of laths in the yard of the consignee, where the bill of lading contains no provision as to such piling.

In Admiralty. Suit to recover freight and demurrage.

*Hyland & Zabriskie*, for libelant.

*A. B. Cruikshank* and *Peter Carter*, for claimant.

BENEDICT, J. This is an action to enforce a lien for freight and demurrage upon a cargo of laths and lumber shipped at Ottawa, on board the schooner Nora Costello, to be transported therein to the port of New York. It appears that the Nora Costello and another similar boat, owned by the same owner, having been waiting in Ottawa some time for business, were furnished a cargo by D. Murphy & Co. By direction of D. Murphy & Co., they went to a designated lumber yard and there were loaded, no agreement as to the rate of freight having been made. When the boats were loaded the shipper was, for the moment, for some reason, unable to prepare bills of lading, and it was then agreed between him and the owner of the boats that the boats should start at once upon the voyage, and that he would make out bills of lading for the cargoes,

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

and send them to his agent at Montreal, where the boats could obtain them. The boats accordingly started upon the voyage without bills of lading. On the arrival of the boats at Montreal, bills of lading for each boat, sent by the shipper at Ottawa for them, were delivered to the owners of the boats in Montreal, and the boats thereupon proceeded to New York with their cargoes. The bill of lading of the Nora Costello was delivered to the master of the Nora Costello, but was never signed by any one. It was a blank bill of lading regularly filled up, and apparently a captain's copy of the bill of lading of the cargo in question. With these bills of lading in hand, the boats proceeded to New York, and there delivered their respective cargoes. Both bills of lading received at Montreal provided for a rate of freight of 55 cents per thousand of the laths, and the other boat was paid her freight at that rate. The Nora Costello, upon arrival at New York, was reported to E. R. Weed, the consignee named in the bill of lading, and Weed instructed the master to tow his boat to H. S. Christian's yard, and there deliver the cargo. Accordingly, the boat proceeded to Christian's yard, as directed, and there delivered the laths to Christian, who had purchased them of Weed, and the lumber to Ross, who had purchased it also from Weed. Christian had instructions from Weed to pay the freight on the cargo, and the cargo, on arrival at his yard, was reported to him. He received the laths from the vessel in his carts, by which the laths were carted to a place in his yard some 300 feet from the vessel. There the laths were piled up by men employed by Christian, but, as he claims, for the benefit of the vessel. Immediately upon the completion of the landing of the cargo, the master made a demand on Christian for freight and demurrage. Christian, who, as already stated, had been authorized to pay the freight by Weed, the consignee named in the bill of lading held by the captain, claimed to deduct from the freight the sum he had paid for piling the laths, refused to pay any demurrage, and offered to pay the freight at the rate of 50 cents per thousand, subject to the reduction for piling, but refused to pay freight at the rate of 55 cents per thousand. The master at once notified Christian that his lien upon the cargo had never been abandoned, and that he would at once enforce it by seizing the cargo, and thereupon, after some fruitless requests, the master filed his libel against the laths and lumber, and the marshal took possession of the laths remaining in Christian's yard, and the lumber in Ross' yard. Upon these facts the contention, in behalf of the claimant of the laths, is that the lien for freight and demurrage was abandoned, and no longer exists.

My opinion, however, is that the lien for freight cannot be held, upon the facts proved, to have been abandoned. The proofs show that the laths were proceeded against while they were still in the place where they had been deposited at the time they were landed, and before any change of ownership had occurred, and that the person who received the laths was the person who, by arrangement between him and the consignee, was to pay the freight, and who concedes that the demand for freight was accompanied by notice of the lien and of an intention to en-

force it, and that this notice was given as soon as the landing of the laths was completed. So that it may properly be found that the landing of the cargo, demand of freight, notice of intention to hold the lien, and seizure for the freight, were, in substance, simultaneous. To such a case the remarks of the supreme court of the United States, when deciding the case of *Bags of Linseed*, 1 Black, 108, seem especially applicable:

"Courts of admiralty," says the court, "when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. And it often happens that the necessities and usages of trade require that the cargo should pass into the hands of the consignee before he pays the freight. It is the interest of the ship-owner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery; and it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty. The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by the fault of the ship. It is his duty, and not that of the ship-owner, to provide a suitable and safe place on shore, in which they may be stored; and several days are often consumed in unloading and storing the cargo of a large merchant vessel; and if the cargo cannot be unladen and placed in the warehouse of the consignee without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the ship-owner and the merchant."

The necessities of commerce, spoken of in the above extract, forbid, as it seems to me, a decision which should prevent the master of a vessel from dealing with his cargo as the master has done in the present instance; and this, whether the lien for freight be considered a maritime hypothecation, or deemed to depend upon a constructive possession of the cargo by the master. It is insisted, however, that the decision made by the court in the case of the *Bags of Linseed* was adverse to the lien, and compels a decision adverse to the lien in this case. But that case was very different from this. There, a shipment of linseed in bags was delivered, part of it into another ship for shipment to another port, and the rest to the representative of the consignee, and by him removed from the place of discharge to a public store-house, and there entered in bond in the name of the consignee, without any notice of intention to hold the lien for freight being given at any time, and when the libel for freight was filed, the goods had passed under the control of the United States, in a public store. In such a case the lien for freight could well be held to have been abandoned. Indeed, it is not seen how jurisdiction to declare the goods subject to a lien had ever been acquired, if, as the case seems to show, the goods, at the time of filing the libel, were in a bonded warehouse, in the custody of the United States, under the warehousing act, upon an entry made in the name of the consignee under that statute. But, however this may have been, it cannot be doubted

that the method of dealing with the cargo by the consignee, disclosed in that case, and which was permitted by the ship-master without notice or suggestion of an intention to enforce the lien for freight, was sufficient to warrant a decision that the lien had been abandoned. That decision cannot, however, as it seems to me, be held to cover such a case as the present. Indeed, an intention on the part of the court to prevent the decision from being held applicable to a case like the present seems to be indicated by the remarks in the opinion which had been quoted above. When closely examined, the opinion delivered permits the conclusion that the court intended to declare no more than this, namely, that the lien for freight is not lost so long as the cargo remains in the actual or constructive possession of the ship-master; that cargo may "pass into the hands" of the consignee, and still be in the constructive possession of the ship-master; and that cargo will be held to be in the constructive possession of the ship-master when the facts proved fail to show a delivery made with the intention on the part of the ship-master to abandon the lien for freight. Such seems to have been the opinion of Mr. Justice CLIFFORD, who, in the opinion delivered at the circuit shortly after the decision in the case of *Bags of Linseed,* said:

"The lien [for freight] is one that is favored by the courts, and will be enforced, unless clearly displaced by the acts of agreements of the parties." *The Anna Kimball,* 2 Cliff. 4.

It may also be noticed that Mr. Justice NELSON participated in the decision rendered in the *Bags of Linseed* case, without alluding to his prior decision made at the circuit in the case of *One Hundred and Fifty-One Tons of Coal,* 4 Blatchf. 368, where he said:

"Now, the mere manual delivery of the coal by the carrier to the consignee does not, of itself, operate, necessarily, to discharge the lien. The delivery must be made with the intent of parting with his interest in it, or under circumstances from which the law will infer such an intent. The act of the party is characterized by the intent with which it is performed, either expressly or by necessary implication."

If Mr. Justice NELSON had understood that the opinion delivered in the *Bags of Linseed* case declared a different law from that declared by him in the case of *One Hundred and Fifty-One Tons of Coal,* it may well be believed that he would not have allowed that opinion to pass without remark from him. The claimants also cite the case of *Egan v. A Cargo of Spruce Lath,* 41 Fed. Rep. 830, (decided by Judge BROWN, February 25, 1890, and since affirmed by the circuit court, 43 Fed. Rep. 480,) as an authority adverse to the lien in this case. But in that case no demand for freight was made as soon as the laths were delivered. Here, demand was so made. There, no demand for freight was made of the person to whom delivery was made. Here, demand was made of the person as soon as, and at the place where, the laths were discharged. There, the delivery was made in expectation that the freight would be paid, either by the consignee or by the shipper; and that shipper was at Quebec or Whitehall. And the court finds the facts proved in that case to be inconsistent with an intention to hold a lien for freight after the

delivery. Therefore, because an absence of intention to hold the lien was proved, the lien was held to have been abandoned. In the case at bar the facts proved justify a finding that the act of discharging the laths was accompanied by a present intention to hold the laths for freight. Such a finding compels a decision that the lien for freight had not been abandoned.

Thus far the question under discussion has been confined to the lien sought to be enforced against the laths; but the libel is filed not only against the laths, but also against some lumber that formed part of the cargo, and was bought from the consignee by a different party from the party who had bought the laths. The facts attending the discharge of the lumber differ somewhat from the facts attending the discharge of the laths. But, inasmuch as a joint answer by the owner of the laths and the owner of the lumber was permitted to be filed without objection, and a single bond was given for both laths and lumber, which bond is executed by the claimant of the laths, who, as it appears, was, by arrangement with the original consignee of the cargo, to pay the freight on both the lumber and the laths, it seems unnecessary to consider whether the lien still attaches to the lumber. Justice will be done by holding the bondsmen liable for the whole freight and dismissing the libel against the lumber without costs, without destroying the question of lien.

The next question to be considered is whether the master's demand for freight at the rate of 55 cents per thousand was justified. The bill of lading delivered to the master at Montreal, under which the voyage was thereafter performed, fixes the rate of freight at 55 cents per thousand. The original consignee, Weed, refused to pay more than 50 cents, because he had received from D. Murphy & Co. what purported to be a bill of lading in which the rate of freight was stated to be 50 cents per thousand. This bill of lading was signed by one of the firm of D. Murphy & Co. as agent of the master, but it was never exhibited to the master or the owner until after the completion of the voyage, and its execution by the shipper as agent of the master was without authority. The bill of lading first issued by the shipper and delivered by his agent at Montreal to the owner of the boat, and under which the voyage was thereafter performed, must be deemed to be the contract binding upon the parties and the cargo. It follows that the master was right in demanding freight at the rate of 55 cents.

The next question to be considered is whether the amount paid by Christian for piling the laths in his yard can be deducted from the freight. Here the provision in the bill of lading, "the consignee to have the option of unloading cargo at the rate of 20 cents per thousand feet," should, as it seems to me, control. Under this the master was bound to unload his cargo, unless the consignee elected to do it, for 20 cents per thousand. Christian refused to unload the laths under the provision of the bill of lading, and the only remaining duty upon the master was to unload it himself into the carts which the consignee provided. He was not bound to pile the laths in the rear of the consignee's yard, nor can he be charged the expense of such piling, never having agreed so to do. The libelant

is therefore entitled to recover his freight without any deduction for the expense of piling.

In addition to the claim for freight the libel also seeks to recover six days' demurrage at the rate named in the bill of lading.    Upon the testimony, I am of the opinion that the master can charge for two days' demurrage, and no more.    A decree will therefore be entered in favor of the libelant against the laths seized, in accordance with this opinion. The amount, as I figure it, is $169.74, with interest from September 27, 1888.