MICHIGAN S. S. CO. v. THORNTON et al.

(Circuit Court of Appeals, Fifth Circuit. March 28, 1905.)

No. 1,437.

SHIPPING—FREIGHT—LIEN—DELIVERY OF CARGO.

A charter party provided that freight should be payable in cash on delivery of each cargo, that the ship should have a lien on all cargo and subfreights for freight money due under the contracts though the cargoes might have been delivered. The consignee at first paid the freight to the steamship company, and remitted to the shipper for the value of the cargo, but thereafter insisted on paying the entire amount to the shipper, leaving the latter to settle for freight. *Held* that, the consignee having remitted to the shippers for a cargo after delivery, including freight, which remittance was received by the shipper's receivers, the money so received was impressed with a trust in favor of the shipowner for freight.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

James Legendre, for appellant.

Henry P. Dart and Benj. W. Kernan, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. On October 19, 1901, the appellant, the Michigan Steamship Company, entered into a contract with the Lone Star & Crescent Oil Company, whereby the steamship company agreed to transport oil cargoes for the oil company from Sabine Pass, Tex., or other equivalent Gulf port, to New York, or other equivalent Atlantic port, of which Marcus Hook, Pa., is agreed to have been an equivalent, for five years at the rate of 37 cents per barrel of 42 gallons each. On December 15, 1902, the steamship company, by its steamship Roma, carried a cargo of bulk oil from Sabine Pass to Marcus Hook, the oil being consigned to the steamship company, and the amount of the cargo being 21,092$^{18}$/₁₀₀ barrels of 42 gallons each.. This cargo of oil, prior to its receipt by the steamship Roma, had been contracted to be sold to, and was to be delivered by the Lone Star & Crescent Oil Company to, the United Gas Improvement Company of Philadelphia, at the rate of 67⅓ cents per barrel of 42 gallons each, f. o. b. Philadelphia: it being tacitly understood between the steamship company and the oil company that the amount of 67⅓ cents per barrel was made up of the two sums of 30⅓ cents, representing the value or price of the oil at Sabine Pass, loaded on the steamship, and 37 cents freight money for the transportation and delivery of the oil at its destination. From or soon after the date of the contract the steamship Roma had been engaged in like carriage between these points under the charter party before referred to, and in the beginning of operations thereunder settlements for freight charges were successively made by the gas company, by order of the oil company, directly with the steamship company, for several cargoes of oil as and when received; but the gas company finally ob-

jected to this mode of settlement, and insisted upon paying the entire amount of the price of the cargo, including freight charges, namely, 67⅕ cents, at one time, directly to the oil company, for each cargo, such settlement between the gas company and the oil company being made between the 1st and 10th days of each month by remittance of New York exchange, leaving it to the oil company to make settlement for freight charges directly with the steamship company. On January 6, 1903, the gas company, in payment of the contract price of the cargo of December 15, 1902, remitted to the oil company in New Orleans, La., the sum of $14,173.94 in New York exchange, payable to the order of the oil company, together with a voucher showing the amount of oil received and the price thereof. It was customary for the oil company, upon receiving a remittance from the gas company to forward to the steamship company by exchange the amount due it for freight money on each cargo out of the sum received from the gas company in payment of the price thereof, such remittance to the steamship company being usually made about the 10th day of each month. The New York exchange covering the cargo of oil of December 15, 1902, reached the office of the oil company in New Orleans on January 8, 1903. On the previous day the appellees Crandell and Lemle had been appointed receivers of the oil company (by the court in which this intervention is filed), and they, on January 10th, deposited the funds resulting therefrom in the Citizens' Bank of Louisiana to the receivers' account, where the same is now on deposit.

The appellant, by its intervention in the receivership suit, averred and claimed that the sum of $7,286.60 of the amount so received by the receivers and deposited to their credit belongs to it in full ownership, and is not an asset of the defendant company. The receivers duly answered this petition, but it is not necessary to recite the terms of their answer. The matter was referred to a master, who reported the facts substantially as herein already recited, with his conclusion of law that by the delivery of the cargo of oil to the gas company by the ship, pursuant to the contract of charter-party, which, in terms, provide a lien upon the cargo for freight in the usual form of words, namely "Freight payable in cash upon delivery of the cargo," if nothing else is to be considered but the bare contracts of charter party, the right of lien for freight in favor of the ship was lost, and, being lost, cannot be revived by a court of equity. He concluded that under another agreement (which we have not thought it necessary to recite) the appellant was entitled to payment out of the fund to the extent of $2,109.16, and that the steamship company was entitled to recover an ordinary judgment or decree against the receivers for the balance due it of the charter money on the cargo. His report was duly excepted to, and the exceptions having been considered by him were elaborately discussed in a second report, which overruled the exceptions, and adhered to his first findings of fact and law. The case coming on for hearing before the court on the report of the master and the appellant's exceptions thereto, the exceptions were overruled, the master's report affirmed, and a decree passed that the steamship company have and recover judgment of the oil company in the sum of $7,286.60, and that the receivers, A. W.

Crandell and Gustave Lemle, pay the steamship company on account of that debt the sum of $2,108.18 out of the proceeds of the cargo of oil referred to in the master's report, now in the hands of the receivers; that as to the remainder of the debt, to wit, $5,177.42, the interveners be classified as ordinary creditors of the oil company, and the debt await the settlement of the estate in due course. In addition to the provision (substantially, but not exactly, quoted in the master's report), "Freight money payable in cash on delivery of each cargo," there is also this other provision in the contract of October 19, 1901: "That the steamship company shall have a lien upon all cargoes and all subfreights for freight money due under these contracts, although said cargoes may have been delivered to the oil company; and the oil company shall have a lien on the ship for all moneys paid in advance and unearned." In a second or supplementary contract, entered into on the 7th of April, 1902, between the parties to the contract of October 19, 1901, and providing for additional ocean tonnage, if required, it is stipulated: "Freight money, to which shall be added 5 cents for each barrel of 42 gallons as a bonus for furnishing tonnage additional to the Roma, payable in cash on the 15th day of each month," etc., in which supplementary contract the provision is retained "that steamship company shall have a lien upon all cargoes and subfreights for freight money due under these contracts, although said cargoes may have been delivered to oil company, and oil company shall have a lien upon the said tonnage for moneys paid in advance and unearned."

Even "courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. And it often happens that the necessities and usages of trade require that the cargo shall pass into the hands of the consignee before he pays the freight. It is to the interest of the shipowner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery. And it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty. The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by fault of the ship. It is his duty, and not that of the shipowner, to provide a suitable and safe place on shore in which they may be stored; and several days are often consumed in unloading and storing the cargo of a large merchant vessel. And if the cargo cannot be unladen and placed in the warehouse of the consignee without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the shipowner and the merchant. "It is true that such a delivery, without any condition or qualification annexed, would be a waiver of the lien; because, as we have already said, the lien is but an incident to the possession, with the right to retain. But in cases of the kind above mentioned it is frequently—

perhaps more usually—understood between the parties that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and that the shipowner reserves the right to proceed in rem to enforce it if the freight is not paid.   And if it appears by the evidence that such an understanding did exist between the parties before or at the time the cargo was placed in the hands of the consignee, or if such an understanding is plainly to be inferred from the established local usage of the port, a court of admiralty will regard the transaction as a deposit of the goods, for the time, in the warehouse, and not as an absolute delivery; and on that ground will consider the shipowner as still constructively in possession so far as to preserve his lien and his remedy in rem."   Bags of Linseed, 66 U. S. 114, 115, 17 L. Ed. 35.

In The Bird of Paradise, 72 U. S. 555, 18 L. Ed. 662, we find this language:

"Parties, however, may frame their contract of affreightment as they please, and, of course, may employ words to affirm the existence of the maritime lien, or to extend or modify it, or they may so frame their contract as to exclude it altogether.   They may agree that the goods, when the ship arrives at the port of destination, shall be deposited in the warehouse of the consignee or owner, and that the transfer and deposit shall not be regarded as the waiver of the lien; and where they so agree, the settled rule of this court is that the law will uphold the agreement and support the lien."

We quote the language of the Supreme Court in another case—The Lottawanna, 88 U. S. 582, 22 L. Ed. 654:

"The court [the proceeding was in admiralty] has power to distribute surplus proceeds to all those who can show a vested interest therein, in the order of their several priorities, no matter how their claims originated.   The propriety of such a distribution in the admiralty has been questioned on the ground that the court would thereby draw to itself equity jurisdiction.   But it is a wholesome jurisdiction, very commonly exercised by nearly all superior courts, to distribute a fund rightfully in its possession to those who are legally entitled to it; and there is no sound reason why admiralty courts should not do the same.   If a case should be so complicated as to require the interposition of a court of equity, the District Court could refuse to act, and refer the parties to a more competent tribunal."

Here we are in a court of equity, and the recitation of the facts which we have made are sufficient, we think, to show to the enlightened conscience of the chancellor that the appellant was entitled to the amount it claimed on the ground that it urged, namely, that the sum of $7,286.60, obtained by the receivers in the manner specified, and then and now retained by them, belongs to the steamship company in full ownership, and is not an asset of the defendant company.   And, waiving any express decision of the question as to the maritime lien extended and retained by contract, we, on this latter ground, conclude that the money received by the oil company and by its receivers was and is charged in their hands with a trust in favor of the appellant.   We therefore direct that the decree of the Circuit Court shall be so amended as to require that A. W. Crandell and Gustave Lemle, receivers of the Lone Star & Crescent Oil Company, pay to the Michigan Steamship Company the full amount of $7,286.60 out of the proceeds of the cargo of oil referred to herein, and now in the hands of the receivers, with its costs in the Circuit Court and in this court.