**LOGISTICS MANAGEMENT, INC., dba
TWI Ocean Logistics Services,
Plaintiff–Appellant,**

v.

**ONE (1) PYRAMID TENT ARENA,
in rem, Defendant–Appellee,**

**and**

**Pebbles Music, Inc., Claimant–Appellee,**

**and**

**Chariot Entertainment, Inc.;
Diamond Entertainment
II, Inc., Defendants.**

No. 94–56605.

United States Court of Appeals,
Ninth Circuit.

Submitted May 6, 1996.*

Decided June 18, 1996.

---

\* The parties stipulate and the panel unanimously agrees that this case is suitable for submission on the record and briefs and without oral argument. Fed. R.App. P. 34(f), Ninth Circuit R. 34–4.

Thomas A. Russell, Williams, Woolley, Cogswell, Nakazawa & Russell, Long Beach, California, for plaintiff-appellant.

Edward M. Kubec, Edelstein, Laird & Sobel, Los Angeles, California, for defendants-appellees.

Before: HALL, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether a non-vessel-operating common carrier has a maritime lien against cargo in its possession for unpaid freight.

## I

Logistics Management Inc., dba TWI Ocean Logistic Services ("TWI"), appeals the district court's dismissal for lack of subject matter jurisdiction over TWI's admiralty action seeking to collect tariff charges and to foreclose a maritime lien against an item of cargo: One (1) Pyramid Tent Arena ("the Pyramid"), a five-story modular tent-like structure transported by TWI from England to California.

Pebbles Music, Inc. ("Pebbles") owns the Pyramid. On February 24, 1994, Pebbles leased the Pyramid to Diamond Entertainment II, Inc. ("Diamond"), which is the predecessor in interest to Chariot Entertain-

ment, Inc. ("Chariot"). Under the lease agreement, Diamond assumed responsibility for the costs of transporting the Pyramid from Birmingham, England to the back lot of the Imperial Palace Hotel and Casino in Las Vegas, Nevada for use as the arena for a series of American Gladiators performances.

■ Appellant TWI, a non-vessel-operating common carrier ("NVOCC"),[1] entered into a contract of carriage with Diamond to transport the Pyramid from England to Las Vegas. TWI issued a combined transport bill of lading, consigned to Diamond, for transport of the Pyramid. The notation "FREIGHT PREPAID" appears on the face page of the bill of lading. The contract provides that "[t]he Carrier [TWI] shall have a lien on the Goods and any documents relating thereto for all sums payable to the Carrier under this Contract...."

■ TWI contracted with an ocean carrier, Maersk Pacific, Ltd. ("Maersk"), to transport the Pyramid from Felixstowe, England to Newark, New Jersey on Maersk's vessel, the *Lauren*.[2] The *Lauren* discharged the Pyramid on April 1, 1994, in the Port of Newark, and TWI paid Maersk in full for its ocean transport services.

Six weeks later, the Pyramid was delivered to a rail carrier for transport to Long Beach, California. The Pyramid arrived in Long Beach on June 1, 1994, but TWI refused to deliver the Pyramid to Las Vegas, claiming that Diamond and Chariot failed to pay freight and related charges of more than $250,000.

On June 27, 1994, TWI filed a verified complaint for foreclosure of a maritime lien against the Pyramid *in rem*, and for collection of tariff charges against Diamond and Chariot *in personam*. TWI also filed an ex parte application for maritime arrest of the Pyramid. The district court granted the application for maritime arrest, ordering Maersk to be appointed the Pyramid's substitute custodian (in lieu of the U.S. Marshal) pending TWI's action.

In July 1994, intervenor-claimant Pebbles filed a verified claim to the Pyramid and applied for a mandatory injunction against Diamond and Chariot, seeking an order compelling them to pay TWI for the freight and related charges involved in transporting the Pyramid. The district court denied the request for an injunction.

On October 12, 1994, without presenting factual findings or legal analysis, the district court granted Pebbles' motion to dismiss for lack of subject matter jurisdiction (under Federal Rule of Civil Procedure 12(b)(1)) as to TWI's *in rem* action against the Pyramid, and further ordered the dismissal of TWI's *in personam* action against Diamond and Chariot. TWI filed a timely notice of appeal.

In August 1995, this court dismissed Diamond and Chariot as appellees for failure to appoint new counsel.

**II**

■ As a threshold matter, Pebbles contends that the determination of a valid lien is a prerequisite for jurisdiction over TWI's

1. An NVOCC is "[a] consolidator who acts as a carrier by arranging for the transportation of goods from port to port...." *National Labor Relations Bd. v. International Longshoremen's Ass'n, AFL–CIO*, 447 U.S. 490, 496 n. 8, 100 S.Ct. 2305, 2309 n. 8, 65 L.Ed.2d 289 (1980); *see* 46 U.S.C.A.App. § 1702(17) (West Supp.1996) ("[an NVOCC is] a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier"); *All Pacific Trading v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1430 (9th Cir.1993) (citation omitted) ("Conversely, an NVOCC is considered a carrier in its relationship with the shipper of the goods."), *cert. denied sub nom. Hanjin Container Lines, Inc. v. Tokio Fire & Marine Ins. Co.,* —— U.S. ——, 114 S.Ct. 1301, 127 L.Ed.2d 653 (1994). NVOCCs are regulated by the Federal

Maritime Commission ("FMC"). *See Insurance Co. of North Am. v. S/S Am. Argosy*, 732 F.2d 299, 301 (2d Cir.1984) ("[the NVOCC] files a rate tariff with the Federal Maritime Commission and is subject to all laws governing common carriers").

2. The "shipper" is the party who supplies the goods to be transported, and the "carrier" is the transporter. 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 10–5, at 28 (2d ed.1994). "Freight" refers to the carrier's charge for transportation. 2 *id.* § 10–6, at 31. As an NVOCC, TWI is a common carrier with respect to Diamond as shipper, and a shipper with respect to the vessel *Lauren* and her owner, Maersk. 2 *id.* § 10–7, at 34–35.

admiralty action. TWI disagrees. We review de novo the district court's conclusion that it lacked subject matter jurisdiction. *Seven Resorts, Inc. v. Cantlen,* 57 F.3d 771, 772 (9th Cir.1995).

In *The Rock Island Bridge,* 73 U.S. (6 Wall.) 213, 18 L.Ed. 753 (1867), the Supreme Court stated: "The lien and the proceeding *in rem* are, therefore, correlative-where one exists, the other can be taken, and not otherwise." *Id.* 73 U.S. at 215; *see* Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 9-19, at 622 (2d ed. 1975) ("In American jurisprudence the existence of a maritime lien is synonymous with the availability of a libel *in rem.*").

■ Thirty years after *The Rock Island Bridge,* the Supreme Court indicated that the minimum requirements for admiralty jurisdiction are the *res* and a maritime contract. In *The Resolute,* the Supreme Court stated:

Jurisdiction is the power to adjudicate a case upon the merits, and dispose of it as justice may require. As applied to a suit *in rem* for the breach of a maritime contract, it presupposes, first, that the contract sued upon is a maritime contract; and, second, that the property proceeded against is within the lawful custody of the court. These are the only requirements necessary to give jurisdiction. Proper cognizance of the parties and subject-matter being conceded, all other matters belong to the merits.

. . . . In fact, the question of lien or no lien is not one of jurisdiction, but of merits.

It is true that there can be no decree *in rem* against the vessel except for the enforcement of a lien given by the maritime law, or by a state law; but if the existence of such a lien were a question of jurisdiction, then nearly every question arising upon the merits could be made one of jurisdiction.

*The Resolute,* 168 U.S. 437, 439–40, 18 S.Ct. 112, 113, 42 L.Ed. 533 (1897).[3]

■ The Supreme Court's statement that "the question of a lien or no lien is not one of jurisdiction, but of merits" has been cited with approval by this court. *See, e.g., Melwire Trading Co. v. M/V Cape Antibes,* 811 F.2d 1271, 1273 n. 1 (9th Cir.) ("the Supreme Court held that the question as to whether a maritime lien exists is not one of jurisdiction, but rather involves the merits"), *amended on other grounds,* 830 F.2d 1083 (9th Cir.1987); *Beverly Hills Nat'l Bank & Trust Co. v. Compania De Navegacione Almirante S.A., Panama,* 437 F.2d 301, 305 n. 5 (9th Cir.) ("It is immaterial to admiralty jurisdiction that the claim of lien ultimately failed. '[T]he question of lien or no lien is not one of jurisdiction, but of merits.'"), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971).

■ Since TWI's bill of lading, which contains a clause reserving a lien on the cargo for freight, is a maritime contract (involving ocean carriage)[4] and since the Pyramid is physically within the "lawful custody of the court," TWI satisfied the "only requirements necessary to give jurisdiction." *See The Resolute,* 168 U.S. at 439, 18 S.Ct. at 113.

Accordingly, the district court erred in dismissing TWI's action against the Pyramid for lack of subject matter jurisdiction. Ordinarily, this conclusion would end our inquiry and necessitate a remand to give the district court an opportunity to consider the legal question of whether an NVOCC such as TWI is entitled to a maritime lien on cargo. However, because the district court dismissed TWI's *in rem* action on the ground that an NVOCC cannot claim a maritime lien on cargo,[5] we are in a position to review de novo

---

**3.** Although Gilmore maintains that *The Resolute* confirmed the notion that a lien is a prerequisite to an *in rem* action, *see* Gilmore & Black, The Law of Admiralty § 9-19, at 622 n. 76, Gilmore does not discuss the Supreme Court's express language that "the question of lien or no lien is not one of jurisdiction, but of merits." *The Resolute,* 168 U.S. at 440, 18 S.Ct. at 113.

**4.** *See The Eddy,* 72 U.S. (5 Wall.) 481, 494, 18 L.Ed. 486 (1866) (holding that contracts of af-

freightment are maritime contracts over which the courts of admiralty have jurisdiction).

**5.** The district court simply stated that it was granting Pebbles' motion to dismiss for lack of subject matter jurisdiction. In its motion, Pebbles did not dispute the existence of TWI's maritime contract or the district court's custody of the Pyramid; rather, Pebbles argued that TWI's *in rem* action should be dismissed on the ground

this purely legal issue, which has been fully briefed on appeal.[6]

## III

The issue of whether an NVOCC can have a maritime lien on cargo is a matter of first impression nationwide.

### A

■ Pebbles argues that TWI is not entitled to a maritime lien on the Pyramid because, as an NVOCC, TWI was not the vessel owner in possession of the cargo and, therefore, lacks standing to assert a maritime lien. We are not persuaded.

Pebbles correctly notes that courts are reluctant to recognize new forms of maritime liens. *See Melwire*, 811 F.2d at 1273 (citations omitted) ("Maritime liens must be construed *'stricti juris*, and cannot be extended by construction, analogy, or inference.' Consequently, '[t]he only liens recognized today are those created by statute and those historically recognized in maritime law.' ").[7]

We do not believe that recognizing an *in rem* lien on cargo in favor of NVOCCs would appreciably expand the universe of maritime liens. The carrier's lien for ocean freight is

well-established and NVOCCs are common carriers regulated by the Federal Maritime Commission ("FMC"). Although TWI neither owned nor operated the vessel transporting the Pyramid, TWI nonetheless assumed responsibility for the transportation as a "carrier" within the meaning of that term in maritime law.

For centuries, courts have held that people who own and operate a vessel have a lien on the cargo transported on their ships. *The Bird of Paradise*, 72 U.S. (5 Wall.) 545, 555, 18 L.Ed. 662 (1866) ("Legal effect of such a lien is, that the ship-owner, as carrier by water, may retain the goods until the freight is paid, or he may enforce the same by a proceeding *in rem* in the District Court."); *In re 4,885 Bags of Linseed*, 66 U.S. (1 Black) 108, 113, 17 L.Ed. 35 (1861) ("The lien of the carrier by water for his freight, under the ordinary bill of lading, although it is maritime, yet it stands upon the same ground with the carrier by land, and arises from his right to retain the possession until the freight is paid, and is lost by an unconditional delivery to the consignee."). Courts later permitted persons who merely *operate* a vessel (but who do not own it) to assert a lien on the cargo transported on that vessel. *T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 449

---

that TWI, as an NVOCC, is not entitled to a maritime lien on cargo.

**6.** In *Melwire*, this court specifically noted "that, although the district court dismissed Melwire's *in rem* claims 'for lack of jurisdiction,' the actual basis for the district court's dismissal was its conclusion that none of Melwire's claims gave rise to a maritime lien enforceable in an action *in rem*." 811 F.2d at 1273 n. 1 (citing *The Resolute*, 168 U.S. at 440, 18 S.Ct. at 113). After considering the merits, the court declined to recognize a maritime lien for damages resulting from a shipping delay or equipment malfunction in the absence of physical damage to the cargo. *Id.* at 1273–74.

**7.** *But see* 1 Schoenbaum § 9–1, at 486 (citations omitted) ("There are sometimes statements in judicial opinions that admiralty law has ceased to recognize new forms of maritime liens. In fact, courts will not readily expand the body of recognized liens, most of which are well established by long practice. Nevertheless, the federal courts have full authority to update old doctrines and to recognize new forms of liens if warranted by new conditions."); *see, e.g., Exxon*

Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991) (overruling 135–year–old precedent to hold that advances made by ship's agent may give rise to maritime lien); *Equilease Corp. v. M/V Sampson*, 793 F.2d 598 (5th Cir.) (en banc) (holding that despite long·precedent to contrary, unpaid insurance premiums give rise to maritime lien), *cert. denied sub nom. Fred S. James & Co. of Texas, Inc. v. Equilease Corp.*, 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986); *see also Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 125, 54 S.Ct. 105, 107, 78 L.Ed. 216 (1933) ("this does not mean that the right to the lien is not to be recognized and upheld, when within accepted supporting principles, merely because the circumstances ... are unusual or infrequent"); *Usher v. M/V Ocean Wave*, 27 F.3d 370, 373–74 (9th Cir.1994) (citation omitted) ("We recognize that a maritime lien is an extraordinary remedy which should be allowed sparingly because it 'is not a matter of public record' and attaches to the vessel without notice. However, this is a characteristic of all maritime liens. Secrecy alone does not justify allowing the remedy for some types of maritime personal injury claims but not for others that are indistinguishable by reason or authority.").

F.Supp. 84, 120 (S.D.Ala.1976), *aff'd in part & rev'd in part,* 629 F.2d 338, 375 (5th Cir. 1980) (holding that time charterer who operated a vessel owned by another had maritime lien for unpaid freight); *Dominica Mining Co. v. Port Everglades Towing Co., Inc.,* 318 F.Supp. 500, 506 (S.D.Fla.1969) (holding that bareboat charterer had lien for unpaid freight), *aff'd without opinion,* 433 F.2d 986 (5th Cir.1970). When these later courts did this, they implicitly recognized that it was the carrier's assumption of responsibility for the transport of the cargo that conferred the lien.

NVOCCs assume the same responsibility for the delivery of cargo as do vessel owners or operators. 46 U.S.C.A.App. § 1702(17) ("[an NVOCC is] a common carrier"); 46 U.S.C.A.App. § 1702(6)(A) ("[a common carrier is] a person that ... assumes responsibility for the transportation from the port or point of receipt to the port or point of destination ..."); *Fireman's Fund Am. Ins. Co. v. Puerto Rican Forwarding Co., Inc.,* 492 F.2d 1294, 1295 (1st Cir.1974) ("although [an NVOCC] may not own the ships on which its customers' goods are physically transported, it nevertheless is the 'carrier' *responsible for the through transportation* of such goods, including the water portion") (emphasis added). We see no reason to deny NVOCCs the same rights to assert a lien that are possessed by these other carriers. We therefore hold that NVOCCs have an *in rem* maritime lien for unpaid freight against the cargo they are responsible for transporting.

■ Moreover, we note that TWI specifically reserved a lien on the Pyramid in its contract of carriage with Diamond. Contractual provisions regarding liens on cargo for freight are enforceable in admiralty. *The Bird of Paradise,* 72 U.S. at 555 ("Parties ... may frame their contract of affreightment as they please, and of course may employ words to affirm the existence of the maritime lien, or to extend or modify it.... [A]nd where they so agree, the settled rule in this court is, that the law will uphold the agreement and support the lien."); *Melwire,*

830 F.2d at 1083 (citations omitted) ("It is well-established that breach of a shipping contract may give rise to a maritime lien."); Eric M. Danoff, Provisional Remedies in Admiralty United States, 4 U.S.F. Mar. L.J. 293, 299 (1992) ("[A] lien on the cargo is normally expressly granted in the bills of lading and charter parties. If so, the extent of the relevant lien is governed by the terms of the lien clause.").

Even if TWI has standing to assert a maritime lien, Pebbles contends that the lien was extinguished by the delivery of the Pyramid to the rail carrier and by TWI's full payment to the ocean carrier. These arguments are meritless and will be addressed in turn.

■ Unlike a maritime lien that attaches to the vessel itself, a lien on cargo for freight is lost by an unqualified delivery of the cargo. *4,885 Bags of Linseed,* 66 U.S. at 113 ("if [the shipowner] delivers [the goods], the incumbrances of the lien does not follow them in the hands of the owner or consignee"); *Beverly Hills Nat'l Bank,* 437 F.2d at 304 (citations omitted) ("It is extinguished by unconditional delivery of the goods.").

■ However, courts have emphasized that the preservation of the cargo lien does not require that the cargo remain on the vessel. Provided that the carrier has not unconditionally delivered the cargo to the consignee, the carrier may preserve the lien by maintaining actual or constructive possession of the cargo. *See 4,885 Bags of Linseed,* 66 U.S. at 114 ("[I]t is frequently, perhaps more usually, understood between the parties, that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and that the shipowner reserves the right to proceed *in rem* to enforce it, if the freight is not paid."); *Beverly Hills Nat'l Bank,* 437 F.2d at 304 ("[T]he vessel owner's lien on cargo for freight continues only so long as the cargo remains in the owner's actual or constructive possession."); *see also* 2 Benedict on Admiralty § 23, at 2–19 to 2–20 (7th ed. rev.1995) [8]

---

8. TWI's counsel of record in this appeal, Thomas A. Russell, authored chapters 2 and 3 of volume

2 of Benedict on Admiralty.

(citing *The Saturnus*, 250 F. 407 (2d Cir.), cert. denied, 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918)) ("Such liens are not strictly a privilege, as are liens on ships, but are approximate to the possessory lien of the land carrier and do not survive unconditional delivery of the cargo."); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 9–1, at 489–90 (2d ed.1994) (footnote omitted) ("The deposit of the goods in a warehouse will not be considered an unconditional delivery giving up the lien, however, if the evidence shows the parties intended to preserve it.").

■ TWI preserved its cargo lien by maintaining actual or constructive possession of the Pyramid until the district court granted TWI's application for its arrest.[9] At no point did TWI deliver the Pyramid, conditionally or unconditionally, to Diamond and Chariot. Accordingly, the fact that the Pyramid was not on board the vessel *Lauren* when TWI filed its complaint in admiralty poses no bar to the enforcement of TWI's cargo lien.

■ In addition, by paying Maersk for the freight due on the bill of lading between Maersk and TWI, TWI by no means extinguished its lien for the freight due on its bill of lading with Diamond and Chariot. By definition, NVOCCs such as TWI have an obligation to pay the freight to the actual water carrier, while expecting to receive from the shipper a slightly higher freight. TWI fulfilled its obligation to Maersk, but Diamond and Chariot failed to satisfy their obligation to pay the freight charged by TWI.[10]

9. On April 1, 1994, the *Lauren* unloaded the Pyramid in Newark, New Jersey. On April 22, 1994, TWI's attorney notified Diamond's attorney by letter that TWI would exercise its possessory lien rights unless Diamond arranged to pay the freight and related charges for the trans-Atlantic journey. TWI stored the Pyramid in a Newark warehouse for six weeks before sending the structure by rail to Long Beach, California.

10. As an alternative theory in support of reversal of the district court's dismissal, TWI argues that the doctrine of advances grants TWI the maritime lien on cargo possessed by Maersk. Since we reverse the district court's dismissal on other grounds, we need not reach this issue.

**B**

Pebbles goes on to contend that the notation "FREIGHT PREPAID" on TWI's bill of lading equitably estops TWI from claiming that Diamond and Chariot did not actually pay the freight. This argument is without merit.

■ "The estoppel doctrine requires that the consignee be in good faith and rely upon the false bill of lading. Without reliance, the holder of the bill cannot have been harmed by any false description of the goods and cannot recover." 2 Schoenbaum § 10–12, at 56 (footnotes omitted); *see Portland Fish Co. v. States S.S. Co.*, 510 F.2d 628, 633 (9th Cir.1974) ("absent reliance, there can be no estoppel").

■ Diamond and Chariot cannot show good faith or detrimental reliance since they did not actually pay the freight to TWI.[11] Unlike the shipper who successfully invoked equitable estoppel on "freight prepaid" bills of lading in *Mediterranean Shipping Co. v. Elof Hansson, Inc.*, 693 F.Supp. 80 (S.D.N.Y.1988), Diamond is not in danger of paying the freight twice. The shipper in *Mediterranean Shipping* paid all freight charges due on the bills of lading to its supplier in reliance on (1) the carrier marking the bills of lading "freight prepaid," and (2) the supplier paying over to the carrier the freight monies received from the shipper. *Id.* at 81. However, unbeknownst to the shipper, the supplier terminated its business without transferring the freight monies to the carrier. *Id.*[12]

11. In a letter (dated Apr. 8, 1994) to Frank Campanelli of TWI, Diamond's attorney conceded that Diamond was having financial difficulties, but claimed that the company intended to pay its "shipping obligations to TWI." If Diamond recognized that it owed TWI the freight for the trans-Atlantic voyage on April 8 (one week after the Pyramid arrived in Newark), then Diamond cannot have detrimentally relied on the "FREIGHT PREPAID" notation stamped on the March 23 bill of lading.

12. Ordinarily, the terms of a bill of lading are strictly construed against the carrier. *See Toyo Kisen Kaisha v. W.R. Grace & Co.*, 53 F.2d 740, 744 (9th Cir.1931). Here, TWI maintains that a

## IV

In its verified complaint, TWI asserted an *in personam* cause of action against Diamond and Chariot for collection of tariff charges under the Shipping Act of 1984.

In response to Pebbles' motion to dismiss TWI's *in rem* action against the Pyramid under a cargo lien theory, the district court dismissed not only TWI's *in rem* lien action, but also TWI's *in personam* action against Diamond and Chariot. The district court dismissed the latter action even though (1) Pebbles' motion referred only to the *in rem* action, and (2) Diamond and Chariot never moved to dismiss the *in personam* action against them. *Cf. Melwire,* 811 F.2d at 1274 & n. 2 (affirming dismissal of admiralty action *in rem,* but stressing that this holding "does not affect any action by Melwire *in personam* against the [vessel owner]").

This court has clearly held "that an implied private cause of action under the Shipping Act allows carriers to sue shippers to collect fees owed pursuant to the published tariffs." *Sea–Land Service, Inc. v. Murrey & Son's Co. Inc.,* 824 F.2d 740, 744 (9th Cir.1987); *see* 2 Schoenbaum § 10–6, at 31 n. 1.[13] Since TWI, as an NVOCC, is "considered a carrier in its relationship with the shipper of the goods," [14] it follows that TWI has a private right of action under the Shipping Act against Diamond and Chariot to collect tariffs filed by TWI with the FMC.

Accordingly, the district court erred in dismissing TWI's *in personam* action against Diamond and Chariot under the Shipping Act.

## V

For the foregoing reasons, we reverse the district court's dismissal of TWI's *in rem* and *in personam* actions, and remand for further proceedings with specific instructions that the district court (1) recognize TWI's lien on the Pyramid, and (2) reinstate TWI's *in personam* action against Diamond and Chariot.

REVERSED and REMANDED.

February 20, 1994 agreement between TWI and Diamond constituted a "due bill" granting credit privileges to Diamond in exchange for issuance of a "FREIGHT PREPAID" bill of lading. *See Mediterranean Shipping,* 693 F.Supp. at 83 (citations omitted) ("[I]t is not unusual for carriers to release bills of lading marked 'freight prepaid' without actual payment of the freight charges where the carriers have a formal credit agreement with shippers or other credit relationship with freight forwarders."). Since it is undisputed that Diamond and Chariot did not pay the freight, detrimental reliance in good faith cannot be shown and, thus, we need not decide whether the February 1994 agreement constituted a credit arrangement.

13. The Shipping Act of 1984 (codified as amended at 46 U.S.C.A.App. §§ 1701–1721 (West Supp.

1996)) regulates the common carriage of goods by water in interstate and foreign commerce. The Act prohibits carriers from collecting charges that differ from those set forth in their filed tariffs. 46 U.S.C.A.App. § 1709(b)(1); *see Sea–Land Service,* 824 F.2d at 741 (citations omitted) ("The Shipping Act's primary purpose is to eliminate discriminatory treatment of shippers and carriers."). In *Sea–Land,* this court held that the district court properly exercised jurisdiction under 28 U.S.C. § 1333 (admiralty) and that "[j]urisdiction also lies under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (regulation of commerce)." *Id.* at 744.

14. *All Pacific Trading,* 7 F.3d at 1430.